J-A03010-21

2021 PA Super 55

| IN THE INT. OF: X.P., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.J.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1106 MDA 2020 |

Appeal from the Dispositional Order Entered August 3, 2020
In the Court of Common Pleas of Berks County
Juvenile Division at No(s): CP-06-DP-0000209-2019

BEFORE:  LAZARUS, J., KUNSELMAN, J., and MURRAY, J.

OPINION BY MURRAY, J.:                          **FILED MARCH 20, 2021**

K.J.P. (Mother) appeals from the amended order of adjudication and disposition with respect to her teenage son, X.P. (Child), which found Mother recklessly caused serious mental injury to Child.[1]  Upon careful review, we affirm.

The trial court summarized the procedural background as follows:

Commencing in May of 2019, and throughout much of 2019, Berks County Children and Youth Services ("BCCYS") investigated reports that Mother was emotionally abusive toward Child and his half-sibling twin sisters.[2]  On November 20, 2019, a Dependency Petition was filed by BCCYS alleging that Child and his twin sisters . . . were without proper parental care and control, and delineating the numerous reports of mental abuse by Mother against Child which were investigated.

---

[1] The record indicates the whereabouts of Child's father was unknown to Berks County Children and Youth Services.

[2] Child's twin sisters, born in May of 2009, are not part of this appeal.  N.T., 4/8/20, at 5.

Trial Court Opinion, 9/25/20, at 1.

Prior to the dependency hearing, on December 22, 2019, Mother participated in a psychiatric evaluation with Maria Ruiza Yee, M.D. Amended Dependency Petition, 1/17/20, at ¶ 31. On January 6, 2020, Child, then 16 years old, participated in an emotional abuse evaluation with Allison Hill, Ph.D., a licensed psychiatrist. *Id.* at ¶ 33; Trial Court Opinion 9/25/20, at 4.

As a result of those evaluations, on January 17, 2020, BCCYS filed an amended dependency petition. BCCYS alleged "Mother is a perpetrator of child abuse in accordance with 23 Pa.C.S. § 6303, in that Child is an abused child. . . . Child has suffered a serious mental injury due to Mother's knowing, intentional, or reckless actions." *Id.* at ¶ 34.

A hearing commenced on January 30, 2020, and continued on April 8, 2020. The court explained:

> At this hearing, Dr. Allison Hill, an expert in the field of mental health and emotional abuse evaluations, testified about her evaluation of Child. In addition, Child himself testified. At the conclusion of the hearing, this [c]ourt found by clear and convincing evidence that Child is a dependent child. Temporary legal and physical custody was transferred to BCCYS for placement purposes.[3] Child's siblings were also adjudicated dependent, with legal and physical custody remaining with Mother.

---

[3] At the conclusion of the evidence, Mother and BCCYS, through their counsel, agreed on the record in open court to Child's adjudication and his placement in kinship care. N.T., 1/30/20, at 69. The court issued an order of adjudication and disposition dated January 30, 2020.

An additional hearing was held on April 8, 2020 on the issue of child abuse. The testimony of Dr. Ruiza Yee, who had performed a psychiatric evaluation of Mother, was taken at that time as well as the testimony of Mother and two BCCYS caseworkers. In an Amended Order of Adjudication and Disposition dated July 28, 2020,[4] this [c]ourt found, by clear and convincing evidence, that Child had sustained "serious mental injury" as defined by 23 Pa.C.S. § 6303(b.1). This [c]ourt further found that Mother is a [p]erpetrator of abuse within the meaning of 23 Pa.C.S. § 6303(a) and 18 Pa.C.S. § 302. This appeal followed on August 27, 2020.

Trial Court Opinion, 9/25/20, at 1-2.

On appeal, Mother presents a single issue:

Did the trial court abuse its discretion and commit an error of law by finding that [M]other recklessly caused serious mental injury to [C]hild where the record does not contain clear and convincing evidence that [M]other caused serious mental injury or that she acted recklessly?

Mother's Brief at 7.[5]

It is well settled that our standard of review in dependency cases "requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion." **In the interest of A.C.**, 237 A.3d 553, 557 (Pa. Super. 2020) (citations omitted). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and

---

[4] The order was docketed on August 3, 2020.

[5] Child's guardian *ad litem* has filed a brief in support of the court's order.

resolve conflicts in the evidence." ***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

While dependency proceedings are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301-6375, the Child Protective Services Law (CPSL), 23 Pa.C.S. §§ 6301-6387, pertains to a court's finding of "child abuse," which must be supported by clear and convincing evidence. ***In the Interest of J.R.W.***, 631 A.2d 1019 (Pa. Super. 1993). Our Supreme Court explained in ***In re L.Z.***, 111 A.3d 1164, 1176 (Pa. 2015), that as "part of [a] dependency adjudication, a court may find a parent to be the perpetrator of child abuse," as defined by the CPSL.

The relevant statute provides:

**(b.1) Child abuse**.— The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:

. . .

**(3)** Causing or substantially contributing to serious mental injury to a child through any act or failure to act or a series of such acts or failures to act.

. . .

23 Pa.C.S. § 6303(b.1)(3). "Serious mental injury" is defined as follows:

A psychological condition, as diagnosed by a physician or licensed psychologist, including the refusal of appropriate treatment, that:

**(1)** renders a child chronically and severely anxious, agitated, depressed, socially withdrawn, psychotic or in reasonable fear that the child's life or safety is threatened; or

**(2)** seriously interferes with a child's ability to accomplish age-appropriate developmental and social tasks.

23 Pa.C.S. § 6303(a) ("Serious mental injury"*)*.

For purposes of the CPSL, the terms "intentionally," "knowingly," and "recklessly" have the same meaning as set forth in 18 Pa.C.S. § 302. 23 Pa.C.S. § 6303(a). Section 302 of the Crimes Code provides:

**§ 302. General requirements of culpability.**

. . .

b) *Kinds of culpability defined.*

**(1)** A person acts intentionally with respect to a material element of an offense when:

**(i)** if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and

**(ii)** if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

**(2)** A person acts knowingly with respect to a material element of an offense when:

**(i)** if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

**(ii)** if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

**(3)** A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and

degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b)(1)-(3).

Here, the court found that Mother recklessly caused serious mental injury to Child. Mother does not dispute that Child sustained serious mental injury; however, she argues she did not cause Child's injury and did not act recklessly.

We begin with the court's factual findings, upon which it concluded that Child sustained serious mental injury. With respect to Child's testimony, the court commented at length:

At the hearing held on January 30, 2020, Child, who was then 16 years of age,[6] bravely testified in the presence of Mother to a series of acts and failures to act by Mother, including physical harm, which occurred over a period of years. He recalled that when he was about 10 years old, he was hit with belts, and that approximately 7 months before the hearing, Mother had thrown hard, plastic lotion bottles and "hair stuff" at him, and then told him to clean it up. (N.T. 1/30/20 at p. 36.) In addition, when he was approximately 10 years old, Mother had punched him in the nose and made him hold a bag over it as he bled. (N.T. 1/30/20 at p. 37.)

Further, once during 2018, when Mother, Child, and Child's twin sisters were all in the car together and Child's sisters were arguing, Mother threatened to crash the car and kill all of them. This scared him. (N.T. 1/30/20 at p. 41.) In addition, Mother once told Child that she would have him arrested and that he would "not . . . be somewhere to not let it happen." (N.T. 1/30/20

_____

[6] Child was in tenth grade at the time of the hearing. N.T., 1/30/20, at 70.

at p. 43.)  In the fall of 2018, Mother attempted suicide by taking pills in front of Child and his sisters; she blamed Child and told him that it was his fault.[7]  (N.T. 1/30/20 at pp. 7-9.)  . . .  [T]he Child "really didn't go to sleep because [he] was always worried about what was going to happen and what was going to happen the next day and stuff like that."  (N.T. 1/30/20 at p. 42.)  As a result, he usually did not fall asleep until approximately 1:00 a.m. *Id.*

. . .  [Mother] did not celebrate Child's sixteenth birthday in November of 2019.  *Id.*  There was no cake and there were no presents for Child's sixteenth birthday, and Mother did not even wish him a happy birthday.  (N.T. 1/30/20 at p. 39.)  This made Child "feel pretty sad."  *Id.*[8]  Mother called Child names such as

---

[7] Child testified about Mother's attempted suicide:  "I think about it a lot of times, especially when she looked at me and told me it was my fault.  I mean, that just messed with my head a couple of times.  . . .  [I]t makes me think I'm a terrible person because I made somebody want to kill themselves, and even my other family members telling me it's not my fault, but I still feel like some of it is."  N.T., 1/30/20, at 66.

[8] Mother testified on cross-examination by BCCYS as follows:

Q. Did you buy [Child] birthday presents at his last two birthdays?

A. This past birthday, no.

Q. Why not?

A. Because everything that was going on.

Q. What do you mean by that?

A. This was in November, all the tension and stuff going on.

Q. So you didn't buy your son a birthday present because of tension and stuff going on with [BC]CYS?

A. We weren't talking.  We weren't getting along.

. . .

"dumb," "retarded," and "pussy"; these were the names that he was called repeatedly. (N.T. 1/30/20 at p. 45.)

There were times when Mother and Child's siblings would come home with food for themselves, and there would be nothing in the home for Child to eat. Child would then call his aunt, and "she would sneak over food for [him] a lot of the times." (N.T. 1/30/20 at pp. 40, 60-61.) When Child was punished, he was not allowed to go outside or go to a friend's house. This once happened for over two months. (N.T. 1/30/20 at p. 40.) [The] Child testified that he usually did not know why he was being punished (N.T. 1/30/20 at pp. 42, 60), and felt that he "had to serve punishment" for things he did not do. (N.T. 1/30/20 at p. 37.)

In 2019, Child was supposed to start school, but he had no clothes for school that fit him because he had grown over the summer and Mother had not purchased new ones for him. Child's grandfather sent clothes to his aunt, and his aunt brought them to Child. (N.T. 1/30/20 at pp. 40, 60.) Child was excited to start school, but when he arrived there, he was told that his Mother had not registered him. (N.T. 1/30/20 at p. 40.) Child testified that he was afraid of Mother. (N.T. 1/30/20 at p. 40.) He wrote a letter to the [c]ourt saying that he did not want to live with his [m]other and wanted to live somewhere else, because he felt that things would not get any better with his [m]other. (N.T. 1/30/20 at p. 44.)

Trial Court Opinion, 9/25/20, at 3-4.

With respect to the testimony of Allison Hill, Ph.D., the court found:

Dr. Hill spoke with Child about school, his home situation, his sisters, . . ., [his] friendships, and about Mother. She had also been provided with a copy of the letter Child had written to the

---

Q. So is it fair to say you were punishing by not giving him a birthday present?

A. No.

N.T., 4/8/20, at 74.

[c]ourt. (N.T. 1/30/20 at p. 7.) When asked what Child had told her about Mother, Dr. Hill testified as follows:

> Well, he told me a number of things. He told me that he was afraid of his mother, that he did not want to stay with her. He told me when I asked him about the relationship with his mother . . . he said it was not good. When I asked him if he thought that could be improved upon, he said no, he's [*sic*] just given up.
>
> He expressed concern that his mother would harm him to the point that he would need to be hospitalized. He reported to me that she has hit him in the past with the belt and has punched him in the nose. He also told me that she threatened to drop h[im] and his sisters off at the police station, and when they were all in the car together on one occasion, she threatened to kill them all, have them all killed in the car. He also reported having difficulty sleeping and being in school because he was thinking about this and worrying about this, essentially, all the time.
>
> . . .
>
> He is very upset and anxious about how his mother has treated him and some of the things that she said, and he believed that she would carry through on some of the threats she has made.
>
> . . .
>
> He reported having difficulty sleeping, feeling nervous and anxious, essentially, all the time. He also reported that his mother had attempted suicide, I believe, approximately two years ago, in front of him and his sisters, and then had blamed him and told him that it was his fault that she was doing that.

(N.T. 1/30/20 at p. 7-9.)

Trial Court Opinion, 9/25/20, at 4-5.

Dr. Hill diagnosed Child with adjustment disorder with mixed anxiety and depressed mood. N.T., 1/30/20, at 9. Dr. Hill testified: "I believed that

the diagnosis is a direct result of the things [Child] told me about his mother, and the effects that those situations and statements have had on him." ***Id.*** In addition, Dr. Hill testified on direct examination:

> Q. [I]n your final assessment of [Child], did you make a statement that . . . the situation with his mother is emotionally abusive for him?
>
> A. Yes.

***Id.*** at 11.

Citing Dr. Hill's testimony, the court concluded that Child sustained serious mental injury. The court reasoned:

> Dr. Allison Hill . . . diagnosed Child with adjustment disorder with mixed anxiety and depressed mood. Child testified in [c]ourt and told Dr. Hill that he constantly worries and is anxious that Mother will harm him. . . . (N.T. 1/30/20, [at 11-12, 41].) Child's statement to Dr. Hill, his letter to the [c]ourt, and his testimony are all entirely consistent, and Dr. Hill made no suggestion either in her testimony or in her written evaluation that Child was not truthful. . . . The evidence is clear and convincing that Child has suffered "serious mental injury" within the meaning of 23 Pa.C.S. § 6303(b.1).

Trial Court Opinion, 9/25/20, at 6.

Mother claims the evidence does not clearly and convincingly prove that she is the cause of Child's serious mental injury, including his adjustment disorder. Specifically, Mother asserts evidence of "other stressors in Child's life" which caused his adjustment disorder. Mother's Brief at 32. Mother also

- 10 -

claims Child was recently diagnosed with multiple sclerosis (MS),[9] and that

Dr. Hill "agreed that when someone receives this type of diagnosis, it can have

psychological effects." *Id.* at 36 (citing N.T., 1/30/20, at 22).

The following exchange occurred during cross-examination of Dr. Hill by

Mother's counsel:

Q. Did [Child] discuss with you the fact that he had recently been diagnosed with multiple sclerosis or some version of that?

A. Yes, he did.

Q. And he provided information to you about his treatment and his state of mind regarding that diagnosis?

A. Yes, he did.

Q. Did you find that to be appropriate, his response to that?

A. Well, generally, yes.

Q. What do you mean by generally?

A. Well, sometimes when someone gets a diagnosis, a serious diagnosis like with them as, they can be more upset about it at times, but sometimes not. **He told me he was not particularly bothered by it at this point.**

Q. [Y]ou would agree that when someone gets that type of diagnosis, it can have negative psychological effects; is that right?

A. **Well, it can, yes, but, again, he is sixteen and he may not fully understand the ramifications of what that diagnosis means . . . or could mean.**

N.T., 1/30/20, at 21-22 (emphasis added).

_____

[9] The trial court found Child was diagnosed with multiple sclerosis in 2018. Trial Court Opinion, 9/25/20, at 4 (citing N.T., 1/30/20, at 43).

Mother's counsel continued:

Q. [A]m I correct that that diagnosis [of adjustment disorder with mixed anxiety and depressed mood] and those symptoms generally result from a stressful life event?

A. Yes, they can. Yes, that's exactly right.

. . .

Q. And it could be possible that those symptoms and that diagnosis could have resulted from the MS diagnosis, correct?

A. **I did not have that impression based upon how [Child] explained his reaction to the MS diagnosis.**

Q. But that certainly could be possible?

A. It's a possibility.

. . .

*Id.* at 23-24 (emphasis added). Our review reveals no evidence (from Dr. Hill, Child, or Mother), that Child suffered psychologically from his MS diagnosis. Therefore, we reject Mother's claim that the diagnosis caused Child's adjustment disorder.

Mother also asserts Child's "stressors" — including changing schools, "possibly being bullied," and "experiencing extreme discord with siblings," caused his disorder. *See* N.T., 1/30/20, at 36. On cross-examination, Dr. Hill testified:

Q. Is it a fair statement that most people who experience some kind of stress experience mild symptoms of this [adjustment] disorder?

A. I would not agree with that, not all the time, no. It has to be a more severe stressor.

- 12 -

Q. Like what?

A. Well, it could be an ongoing stressor, or could be an acute stressor, such as somewhat traumatic event or it could be something that is ongoing.

Q. Could be changing schools?

A. Possibly.

Q. Could be difficulty with friends?

A. It would depend on the difficulty.  It would have to be an extreme level difficulty such as being continuously bullied.

Q. So bullied could account for this diagnosis?

A. It's a possibility.

Q. How about discord with siblings?

A. Again, it would have to be very extreme.

Q. My point is, there are other possible explanations other than emotional abuse that could account for this diagnosis; is that correct?

A. In general, that's correct, yes.

. . .

Q. Discord with [M]other?

A. Yes.

*Id.* at 23-25.

Concerning Child's education, Mother testified, without further explanation, that Child began the 2018-2019 school year in ninth grade at a public high school, but in the spring of 2019, enrolled in cyber school.  N.T., 4/8/20, at 71.  The GAL stated that during the 2019-2020 school year, Child

began attending a different public school.  N.T., 1/30/20, at 76.  There is no evidence regarding what psychological effect, if any, the inconsistency had on Child.  Therefore, we reject Mother's claim that Child's change in schools caused his adjustment disorder.  While Child switched schools more than once during 9th and 10th grade, there is no evidence he had difficulties with bullying at school.  The only evidence of bullying pertained to Mother.  Child testified about Mother's repeated name-calling:  "It makes me feel bad.  And, actually, last year in health class when I was at regular school we were talking about bullying and about if you keep calling the person the name, that they're eventually going to start feeling that way.  And I actually started to feel that way about the names I have been called."  N.T., 1/30/20, at 45.

Also, the discord between Child and his twin sisters is not disputed.  However, there is no evidence that Child's relationship with his siblings, rather than Mother's emotional abuse, caused his adjustment disorder.  Accordingly, we discern no abuse of discretion by the court in concluding that Mother's chronic emotional abuse caused Child's adjustment disorder.  **See** N.T., 1/30/20, at 9, 11 (Dr. Hill opining that Mother's conduct was emotionally abusive to Child, and Child's adjustment disorder "is a direct result of the things [Child] told me about his mother, and the effects that those situations and statements have had on him.").

We further conclude the evidence supports the court's finding that Mother "recklessly" caused Child serious mental injury.  The court explained:

Mother was evaluated by Dr. Ruiza Yee,[10] a psychiatric professional and expert in the diagnosis of major depressive disorder. The purpose of Dr. Yee's evaluation was to assess Mother's mental health condition and to make any recommendations for treatment. (N.T. 4/8/20 at p. 8.) Dr. Yee noted in her report that Mother is a college graduate with a degree in chemistry, and that she works as a medical assistant at a children's hospital. (N.T. 4/8/20, Exhibit 2 at p. 4.) Mother has all required clearances for her job. (N.T. 4/8/20 at p. 57.) Mother had been physically and emotionally abused by her father as a child. (N.T. 4/8/20, Exhibit 2 at p. 4.)

Dr. Yee concluded that Mother suffers from major depressive disorder, which "means that she has a mood instability that is characterized by a period of time where she has tearful episodes, she feels down, she doesn't feel capable of doing anything. . . . Gets easily angered." (N.T. 4/8/20 at 13.) Dr. Yee testified as follows:

> Based on the reports I have and, you know, the numerous instances that were cited, I did conclude that **there was emotional abuse** in the sense that [Mother] was displacing her anger — anger towards [her] father to her son.
>
> . . .
>
> **She was clearly emotionally abusive to her children** in the sense that she would get angry unnecessarily [with] her son — or not unnecessarily, but inappropriately. The degree of her anger towards her son is beyond what the circumstances call for, and same reaction to her daughters. . . . Someone who is suffering from major depressive disorder has a mood disregulation, so they easily — like I said, easily irritable and their response to a situation is out of proportion to the situation. (Emphasis added.)

(N.T. 4/8/20 at 16-17.)

_____

[10] The trial court admitted Dr. Yee's report as Exhibit 2, but it is not included in the certified record.

- 15 -

Dr. Yee also testified that Mother's emotional responses to Child were "not being done **deliberately**," but also that Mother "is cognitively intact" and "has above average intelligence" (emphasis added). (N.T. 4/8/20 at pp. 20, 28.) Mother attempted to minimize her abuse of Child by saying that Child could not give any examples of emotional abuse (N.T. 4/8/20 at p. 10-11), and by denying that she blamed Child for her suicide attempt. (N.T. 4/8/20 at pp. 10-11, 20.) Dr. Yee noted in her report that Mother "has no interest in learning parenting skills as she does not consider herself to be in the wrong." (N.T. 4/8/20, Exhibit 2, at p. 8.) Dr. Yee recommended individual psychotherapy for Mother and that Mother be placed on antidepressant medication. (N.T. 4/8/20, Exhibit 2 at p. 9.)

At the hearing held on April 8, 2020, Mother again denied that she had told Child that her suicide attempt was his fault. (N.T. 4/8/20 at 64-65.) She flatly denied each allegation of abuse made by the Child in his letter to the [c]ourt and in his testimony, and claimed that Child was a frequent liar. (N.T. 4/8/20 at pp. 73-81.) Further, Mother denied that she ever intended anything she said to be emotionally abusive to her son, and testified that she "didn't mean any harm by what she said." (N.T. 4/8/20 at p. 69.) She claimed that conflicts between herself and Child were caused by his failure to complete schoolwork, failure to do chores, playing video games, not coming home on time, and not wanting to go to school. (N.T. 4/8/20 at pp. 58, 65.)

However, Mother also testified that shortly after being diagnosed with multiple sclerosis, Child was given a neuropsychological evaluation and was diagnosed with Adjustment Disorder with Mixed Anxiety and Depression, the same as Dr. Hill's diagnosis. (N.T. 4/8/20 at p. 68.) Mother testified that she had asked Child "a couple times" if [he] wanted to see a therapist, but he said no, and that she had tried to have him speak with a counselor at school about his multiple sclerosis diagnosis, but Child would not keep appointments with him. *Id.* However, Child "was not particularly upset about the MS diagnosis" (N.T. 1/30/20, Exhibit 1, p. 5), and Dr. Hill testified that Child's diagnosis with multiple sclerosis was not the cause of his mental condition. (N.T. 1/30/20 at p. 23). Furthermore, there was no testimony presented that, despite Child's alleged wishes not to see a therapist, Mother, as the parent, arranged for him to see one and ensured that he made it to appointments.

Trial Court Opinion 9/25/20, at 7-8 (emphasis added).  The record supports the trial court.

Mother testified that her relationship with her father was "[t]umultuous. It [has] always been up and down. . . ."  N.T. 4/8/20, at 59.  She stated that her father had physically abused her.  *Id.*  Mother testified:

> Growing up, we used to get . . . beat with belts, sticks.  I remember one time I told him that I hated him, and he picked me up by my neck and held me up against the wall.  When he let me down, he wouldn't let me go upstairs.  I tried to run away[.]  [H]e grabbed me by my shirt, and he punched me in my face.

*Id.* at 59-60.  Mother also testified that her father had interfered with her parenting of Child, for example, taking Child to his home in New Jersey without Mother's permission.  *Id.* at 62-63.

In the following exchange, Dr. Yee responded to questioning about Mother's past:

> Q. Doctor, you . . . noted that [Mother] is particularly hard on [Child] as it is a displacement of her anger towards her father. She did not have a good role model growing up about how functional family life is and moving forward she's constantly reminded of her failure and specifically her children are a constant reminder of the conflictual relationship she had with her father.
>
> [H]ow did this information play into your earlier testimony relative to [M]other being emotionally abusive to her children?
>
> A. [I]t clearly illustrates that she is unable to look at [Child] outside the context of her relationship with the father.  So every time an issue was raised and it calls to light her response as a parent towards her child, it is always clouded by her response to father and what father's response is to her son [*sic*].  So she can never make a healthy and appropriate response to her son just based on the situation that . . . she is faced with.

- 17 -

*Id.* at 21-22. In response to further question, Dr. Yee testified:

Q. [I]n regard to your discussions about [Mother]'s misplaced anger towards her father, do you consider that to be the source of her actions towards her son?

A. No. Only part of that. Because like I said, she suffers from major depressive disorder, and so there is a lot of mood disregulation with that condition, and until that is under control, her emotional responses to situations will be overboard.

Q. But you don't see those emotional responses as something she's doing intentionally or recklessly toward her son. There is a clinical reason for it. Is that what you're saying?

A. Are you saying that this is not being done deliberately?

Q. I guess I am, intentionally or deliberately, yes.

A. No. This is not being done deliberately.

N.T., 4/8/20, at 27-28.

Mother claims "the evidence of her mental health issues may have impacted her behavior in some sense. As such, [M]other did not consciously disregard a substantial or unjustifiable risk that her conduct would result in emotional abuse." Mother's Brief at 32–33.

The term "deliberately" is not defined or mentioned in 18 Pa.C.S. § 302(b). To the extent "deliberately" and "intentionally" are synonymous, the trial court acknowledged Dr. Yee's testimony that Mother did not act deliberately. Trial Court Opinion, 9/25/20, at 7; *see also* 18 Pa.C.S. § 302(b)(1)(i) ("a person acts intentionally with respect to a material element of an offense when if the element involves the nature of his conduct or a result

- 18 -

thereof, it is his conscious object to engage in conduct of that nature or to cause such a result.").

Rather, the court concluded Mother acted "recklessly" by "consciously disregarding a substantial and unjustifiable risk" that serious mental injury exists or will result from her conduct. 18 Pa.C.S. § 302(b)(3). The court further found that "considering the nature and intent of [Mother's] conduct and the circumstances known" to her, her conduct involved a "gross deviation from the standard of conduct that a reasonable person would observe." **Id.** The court reasoned:

> Mother is a college graduate with above-average intelligence. (N.T. 4/8/20 at p. 20). She is cognitively intact. *Id.* There is nothing which would prevent her from understanding her actions and words, or from perceiving the effect those actions and words have had upon Child. Her denials of the allegations of abuse and her claim that Child was a frequent liar lack credibility. **See, Interest of T.G.**, 208 A.3d 487 ([Pa. Super.] 2019) (in a child dependency case, the trial court is free to believe all, some, or none of the evidence presented, and is free to make all credibility determinations and resolve conflicts in the evidence.) Furthermore, Mother has consciously disregarded a substantial and unjustifiable risk that serious mental abuse of Child would result from her actions. She was aware that Child suffered from Adjustment Disorder with Mixed Anxiety and Depression long before he was evaluated by Dr. Hill on January 6, 2020, but did nothing to ensure that Child received therapy for his condition.

> Further, . . . [t]here was no evidence presented that she was helping to alleviate her own condition by engaging in therapy and obtaining medication for her major depressive disorder, as recommended by Dr. Yee. As a victim of physical and mental abuse herself, and as a medical professional who works with children, Mother should have been very sensitive to the effect her words and actions would have upon Child. Under the circumstances known to Mother, her actions involve a gross

- 19 -

deviation from the standard of conduct that a reasonable person would observe in her situation.

Trial Court Opinion, 9/25/20, at 9. Upon review, we discern no error.

Mother testified Child "had a neuropsych evaluation not too long after his MS diagnosis . . . [and] the evaluator diagnosed [Child] and recommended treatment." N.T., 4/8/20, at 68, 72. It appears from the record that Child was diagnosed at that time, and prior to Dr. Hill's diagnosis, with adjustment disorder with mixed anxiety and depressed mood. *Id.* at 83. Mother testified she asked Child "a couple times if he wanted to see a therapist. He told me no." *Id.* at 68. Mother also testified she encouraged Child approximately two years ago to speak to his school counselor, but Child "would never go to see him." *Id.* at 68, 72. As such, Mother's testimony supports the court's finding that she "consciously disregarded a substantial and unjustifiable risk that serious mental abuse of the child would result from her actions." Trial Court Opinion, 9/25/20, at 9. Finally, to the extent Mother's testimony contradicted Child's testimony, *see* N.T., 4/8/20, at 73-80, we reiterate that we may not disturb the trial court's credibility determinations. *See In re M.G.*, 855 A.2d at 73-74.

In sum, we discern no abuse of discretion by the court in determining that Mother recklessly caused Child serious mental injury pursuant to 23 Pa.C.S. § 6303(b.1)(3) and 18 Pa.C.S. § 302(b)(3), and therefore affirm the adjudication and disposition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/30/2021