J-S16032-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.G. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3175 EDA 2022 |

Appeal from the Order Entered December 12, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000778-2022

BEFORE:  DUBOW, J., MURRAY, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                    **FILED JUNE 9, 2023**

K.G. (Stepfather) appeals from the order entered in the Philadelphia County Court of Common Pleas adjudicating his minor stepson K.D. (Child)[1] dependent, and finding he was a perpetrator of Child abuse[2] pursuant to Section 6303(b.1)(1) of the Child Protective Services Law (CPLS).[3]  On appeal, Stepfather argues the Philadelphia Department of Human Services (DHS) did not present clear and convincing evidence that he caused Child's injuries.  We affirm.

_____

[1] Child was born in February of 2019.

[2] At the time of the incident Stepfather was the paramour of Child's mother (Mother).  The record is not clear as to Stepfather's legal status regarding Child; although it does not appear he is Child's legal guardian.  At the hearing discussed *infra*, the trial court also found Mother to be a perpetrator of child abuse.  Order, 12/12/22.  It does not appear that Mother filed an appeal.

[3] 23 Pa.C.S. §§ 6301-6387.

The underlying facts of this matter are as follows. On June 15, 2022, DHS received a report from Child Protective Services (CPS) that Child — who was three years old at that time and resided with Mother and his five siblings[4] — was admitted to the emergency room at the Children's Hospital of Philadelphia (CHOP) for abdominal pain caused by unexplained injuries. N.T. 12/12/22, at 81-82, 97-100, 119-20; *see also* Dependency Petition at 3 (stating Child was "at home" with his five siblings between June 13th through June 15th). Stepfather was also in Mother's home when Child was injured, but it is unclear if he lived there at that time. *See* N.T. at 138, 165-66, 177, 191. Child's injuries were marked as "near fatality" and he remained in the hospital for "approximately 44 days[.]" *Id.* at 95, 102.

After Child was admitted to the hospital, DHS indicated Mother and Stepfather as perpetrators of child abuse and on August 30, 2022, filed a dependency petition regarding Child. N.T. at 131; *see also* Dependency Petition. On December 12, 2022, the trial court held an adjudicatory hearing.[5]

_____

[4] Child's other siblings who were in the home at the time of the incident were aged 10, 9, 7, 6, and 2 at the time of hearing on this matter. *Id.*; *see also* Dependency Petition, 8/30/22, at 3 (unpaginated). The youngest sibling is Stepfather's biological child. *See* N.T. at 6, 129. Child has another maternal half-sibling , who was 11 years old at the time of the dependency hearing, but is not a party to this matter. N.T. at 23; DHS Exhibit 4, at 3.

[5] Immediately preceding the hearing, the trial court heard a tender years motion filed by the Child Advocate. *See* 42 Pa.C.S. § 5985.1 (a)(1)(i)-(ii); N.T. at 10-11. The court granted the motion and found Child and his siblings were unavailable to testify as it would cause them "severe emotion[al] distress." *Id.* at 75-76.

Mother appeared in person with counsel. Stepfather appeared *via* phone and had counsel in the room. Child was represented by Child Advocate Shannon Sherwood, Esquire.[6] DHS presented the evidence as outlined below.

Doctor Kristine Fortin, an attending physician on the CHOP child protection team and an expert in "child abuse pediatrics" stated she began working on Child's case on June 16, 2022, the day after he was admitted to the CHOP emergency room for abdominal pain. N.T. at 79-80, 82. Child had injuries to three organs — a liver laceration, "a hematoma in the area where the stomach becomes the small intestine[,]" and a "transection of his pancreas." *Id.* Child also had "skin injuries" in the form of bruising to his face, ears, back, and chin. *Id.* at 87. Doctor Fortin testified that the bruising

---

[6] The trial court appointed Attorney Sherwood through the Support Center for Child Advocates, as both counsel and guardian *ad litem* (GAL) for Child. *See* Order Appointing Counsel, 8/31/22. "[W]here there is no conflict between a child's legal and best interests, an attorney-[GAL] representing the child's best interests can also represent the child's legal interests." *See In re T.S.*, 192 A.3d 1080, 1092 (Pa. 2018). Further, when "a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests[.]" *Id.*

Instantly, we discern no conflict between Child's legal interests and his best interests. Child was three years old at the time of proceedings and unable to clearly communicate a preference regarding his best interests. *See* N.T, at 32 (Community Umbrella Agency (CUA) Supervisor Erica Butler testified that when she interviewed Child, he "didn't really have the language to describe what's happening to him or understanding of what's happening to him" and at times communicated with her "through motion"). If the trial court determines there is a conflict between Child's preference and his best interests, it must appoint separate legal counsel to advocate for Child's interests in future proceedings.

to Child's face and ears were not common in accidental injuries and the injuries to his organs were "concerning for inflicted trauma." *Id.* at 84, 92. She stated that these types of injuries were caused by "blunt impact[,]" which includes "punching or kicking[.]" *Id.* at 93. She explained she would not "expect [to see Child's injuries] from a regular trip and fall." *Id.*

In the hospital, Child was fed intravenously[7] because he was not "able to eat for a prolonged amount of time[,]" and he was given opiates to manage the pain from his injuries. *Id.* at 85-86, 95-96. Child "receiv[ed] nutrition through intravenous" until July 5th, then "gradually transitioned" to a feeding tube. *Id.* at 85-86. Child's injuries were marked as "near fatality" and he remained in the hospital for "approximately 44 days[.]" *Id.* at 95, 102.

When Doctor Fortin asked Mother about the timeline leading up to Child's admission to CHOP, Mother told her:

> [On] June 13[, 2022,] she went to work and [Child] didn't want to go to daycare, and his younger brother had a telemedicine appointment, so [Stepfather] would be home. So the children stayed home. [Mother] reported that [Child] was doing fine before she went to work. And then when she called [Child] around lunchtime, he said he didn't want to eat. And when she got home, he also didn't want to eat, but he was still walking.
>
> [Mother] reported that the next day[, June 14th,] she took the day off, and [Child] wasn't himself. He was laying around and he had abdominal pain. And then [M]other reported that she was worried it could be related [to a surgery Child had one year prior.

---

[7] Doctor Fortin explained that Child had a "PIC line[,]" which "is just an IV that . . . gets inserted . . . more centrally [so Child] could have it in for a longer period of time." N.T. at 85-86.

Mother] reported that she checked him with a doctor [ sic], and they said if [Child is] keeping [liquids] down to monitor him.

[Mother went to work the next day, June 15th, while Child] was still asleep. [Mother's] sister[, Jasmine,[8]] called and said [Child] wasn't well, and [Mother] reported that when she came home, [Child] wasn't able to walk, and he was in pain. And at that point[,] they brought [Child] to the emergency room.

N.T. at 42-43, 98-99 (paragraph breaks added).

Mother could not provide any instance of "accidental trauma" to explain the abdominal pain, but stated Child had bruising on his chin after he fell off of a bed. N.T. at 98-100. Because of this, the doctor had "high concern" that Child's injuries resulted from "non-accidental trauma[.]" *Id.* at 101-02. Doctor Fortin explained that Child's injuries were "consistent with punches or hits from an adult[,]" "fall[ing] on a bike and impal[ing] yourself on the handlebar[,]" or "getting kicked by a horse[.]" *Id.* at 105, 108, 112. Further, she testified that a "short fall" from a bed, like the one described by Mother, would not typically cause all of Child's injuries. *See id.* at 93-94.

CUA Supervisor Butler,[9] testified that she began working on this case on August 21, 2022. N.T. at 20. Between August 21st and October 5th, Supervisor Butler saw Child and his siblings on a weekly basis. *Id.* at 21. After October 5th, she saw them "[r]oughly" every other week. *Id.* She

_____

[8] DHS did not show concern, nor did Mother or Stepfather present evidence, that Mother's sister was a perpetrator of abuse.

[9] Supervisor Butler also testified during the tender years motion. Her testimony concerning the motion was incorporated into the evidence presented at the hearing. *See* N.T. at 167-68.

testified that when the siblings initially arrived at the hospital after the incident, they gave "varying accounts" of how Child was injured. *Id.* at 37. However, during a November 11, 2022, visit with the children, Child and one of his siblings detailed how Child received his injuries. *Id.* at 35. Child's 10-year-old sibling, Che.L., stated he was at home when he heard Child "screaming" from an upstairs room. *Id.* at 26. Che.L. ran upstairs and "bang[ed] on the door." *Id.* Stepfather "told [Che.L.] to shut up[,] go downstairs[,] and mind his business." *Id.* Che.L. stated that after this incident, the siblings "as a collective" went to Mother and told her Stepfather "[did] this to" Child. *Id.* at 49. Mother "called them liars" and told them to say "[Child] was on the top bunkbed and fell, and [Che.L.] stepped on his stomach[.] *Id.* at 28-29, 40, 49-50. Che.L. expressed he was "scared that he was going to jail" because of this and did not understand why Mother and Stepfather were blaming him. *See id.* at 27, 40. Child told Supervisor Butler that he was "scared" of Stepfather and that Stepfather had "punched" him in the stomach. *Id.* at 30-32. Child also told another DHS investigator[10] at the hospital that Stepfather was "hitting him." *Id.* at 55.

Supervisor Butler also spoke with Mother and Stepfather over the course of this case. During her "third visit"[11] to Mother's home, Mother expressed

_____

[10] It is not apparent from the testimony to whom Child told this information.

[11] Supervisor Butler did not provide a date for this visit, but it appears the visit occurred before October 5, 2022. *See* N.T. at 161-162 (describing an incident *(Footnote Continued Next Page)*

"that she couldn't believe that [Stepfather] would do this to [Child.]" N.T. at 162-64. Supervisor Butler spoke with Stepfather on another occasion[12] and he denied being in the home when Child's injuries occurred, but then later admitted he was present. *Id.* at 165-66. Stepfather denied the allegations that he hurt Child and told another CUA caseworker, Kyle Mitchell,[13] "he would never hurt his kids, [and] that he would never hurt [the youngest, his biological child] in particular[.]" *Id.* at 164. The only explanation that he provided for Child's injuries was that "the kids were roughhousing[,]" but he did not provide a date when the injury occurred. *Id.* at 165-66.

DHS Investigator Anaya Brownwether testified that she became involved with this case after receiving a CPS report on June 15, 2022. N.T. at 119-20. Investigator Brownwether noted there were prior DHS reports related to this family, but could not recall the details. *Id.* at 142-43. The report she received on the 15th alleged Stepfather was "hitting and punching" the Child and his siblings and failing to provide medical attention.[14] *Id.* at 120-21. On June 16th, Investigator Brownwether, along with a hospital social worker,

_____

with Mother on October 5th, and later testifying Mother accused Stepfather of harming Child "before that [October incident] happened.").

[12] Supervisor Butler did not provide a date for this conversation.

[13] Caseworker Mitchell is the currently assigned to this matter, but was not present at the hearing to testify. *See* N.T. at 191-92.

[14] This CPS report also alleged Mother failed to provide medical attention to the children. N.T. at 121.

spoke to Mother, Stepfather, and some of the siblings in the emergency room. *See id.* at 122-23, 127, 137. Initially, Child's siblings had "different stories[,]" which were "all over the place," stating Child "tripped over a shoe, or he fell off a bunkbed, or somebody kicked [him] in the stomach." *Id.* at 137. While in the hospital, Child indicated "Daddy hit him[,]" referring to Stepfather. *Id.* at 138. Two months later in a follow-up interview, the siblings stated Che.L. hurt Child. *Id.* at 137, 144.

When Investigator Brownwether spoke with Mother, she claimed she did not know how or when Child was injured. *See id.* at 123, 126-27, 140. Mother also stated Stepfather was at home all day Monday, June 13th through Wednesday, June 15th — the day Child went to the emergency room. *See id.* at 139-40. Mother was at work that Monday and Wednesday, but was home on Tuesday the 14th. *See id.* at 140.

When speaking with Stepfather, Investigator Brownwether asked him to leave the emergency room waiting area because he was "really loud[,]" "already on the defensive, [and] a little irate." *Id.* at 128-29, 147. The hospital social worker also asked Stepfather to "calm down or they would . . . remove him." *Id.* at 128. During later phone calls, Investigator Brownwether informed Stepfather of the allegations against him and the safety plans DHS was implementing for Child and his siblings. *Id.* at 129-30. Stepfather denied the allegations, said he was "going to do what he want[s] with his son[,]" DHS could not prevent him from seeing his son, and he told Investigator Brownwether to "suck his dick." *See id.* at 130. Investigator Brownwether

indicated Stepfather as a perpetrator of abuse based on "medical evidence[.]"[15] *Id.* at 130-31.

DHS Investigator Shaylyn Kreider testified she began working on this case on November 18, 2022, after receiving a report from CPS that Mother was confining the children in a room without food or water. N.T. at 181-82. That same night, she interviewed each of the siblings. *Id.* at 183. Related to Child's injuries, Che.L. told Investigator Kreider that Stepfather was upstairs with Child when Che.L. attempted to enter the room, but Stepfather told him to go downstairs. *Id.* at 184. When Che.L. later saw Child, he noticed Child "had all these bruises on his body that were not there previously." *Id.* Che.L. and two other siblings also disclosed to Investigator Kreider other physical abuse they suffered at the hands of both Mother and Stepfather. *See id.* at 183-85. On November 30th and December 1st, Investigator Kreider met with each of the siblings again. *Id.* at 187. She noted the children "deni[ed] all allegations against [M]other and denied that they . . . ever spoke to [Investigator Kreider, or] made [those] comments during [her] first visit." *Id.* at 187. Investigator Kreider told the court she believed Mother "coached" the siblings on what to say before her follow-up meetings with them. *Id.* at 188-89.

---

[15] Investigator Brownwether indicated Mother as a perpetrator of child abuse for failing to provide medical care. N.T. at 131.

Neither Mother nor Stepfather testified or presented any evidence. At the conclusion of the hearing, the trial court determined Stepfather was a perpetrator of child abuse against Child under Section 6303(b.1)(1) of the CPSL.[16] N.T. at 205-07. The court noted that while Mother and Stepfather's explanation of Child's injuries— that Child fell off of a bunk bed and his sibling stepped on him — would explain the bruising on Child's chin, it did not explain the injuries to his abdomen. *See id.* at 205-06. Stepfather filed a timely notice of appeal and a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). *See* Pa.R.A.P. 1925(a)(2)(i) ("In a children's fast track appeal[, t]he concise statement . . . shall be filed and served with the notice of appeal.").

Stepfather raises the following claim for our review:

> Did the [trial] court err by making a finding of child abuse as to Stepfather where "clear and convincing evidence" was not provided, that Stepfather, either directly or by neglect caused injuries to [C]hild, as required by 23 Pa.C.S.[ ] § 6303(b)?

Appellant's Brief at 6.

Stepfather alleges the trial court erred in finding that he was a perpetrator of abuse against Child. *See* Stepfather's Brief at 12. Our standard of review of such a challenge

> requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept

---

[16] The court also found Mother was a perpetrator of child abuse against Child. N.T. at 205-07.

- 10 -

the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion. The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence.

*In the Interest of X.P.*, 248 A.3d 1274, 1276 (Pa. Super. 2021) (citations & quotation marks omitted).

Further:

The requisite standard of proof for a finding of child abuse pursuant to [S]ection 6303(b.1) of the CPSL is clear and convincing evidence. [A] petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations, 42 Pa.C.S. § 6341(c)[ ]. Clear and convincing evidence is "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." [ ] However, in certain situations, the identity of the abuser need only be established through *prima facie* evidence. . . .

*In the Interest of C.B.*, 264 A.3d 761, 770-71 (Pa. Super. 2021) (citations, footnote, & emphasis omitted). "Our Supreme Court explained in *In re L.Z.*, [ ] 111 A.3d 1164, 1176 (Pa. 2015), that as part of [a] dependency adjudication, a court may find a parent [or caregiver] to be the perpetrator of child abuse, as defined by the CPSL." *In the Interest of X.P.*, 248 A.3d at 1276 (quotation marks omitted).

The CPSL defines "child abuse" as "intentionally, knowingly, or recklessly [c]ausing bodily injury to a child through any recent act or failure to act[.]" 23 Pa.C.S. § 6303(b.1)(1). "Bodily injury" is defined as "[i]mpairment of physical condition or substantial pain." 23 Pa.C.S. § 6303(a).

- 11 -

Relevant to our discussion, under Section 6381(d) of the CPSL, while the petitioning party must present clear and convincing evidence of child abuse, under certain circumstances the identity of the abuser need only be established by *prima facie* evidence. 23 Pa.C.S. § 6381(d); *see In re L.Z.*, 111 A.3d at 1174. Section 6381(d) establishes a rebuttable presumption for finding child abuse by a parent or person responsible for the Child's care:

> Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S. § 6381(d).

A parent or other responsible caregiver may rebut the *prima facie* presumption with evidence

> [d]emonstrating that the parent or responsible person did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by [DHS] and the rebuttal of the parent or responsible person.

*In the Interest of C.B.*, 264 A.3d at 772 (citation omitted).

Returning to Stepfather's argument, he avers DHS "failed to introduce any evidence" — other than Child's injuries themselves — that he was a perpetrator of abuse. Stepfather's Brief at 17. Stepfather states there was "circumstantial evidence . . . rebutting that" he abused Child as well as evidence corroborating that Child was not injured in the days prior to his

- 12 -

admission to the hospital. *Id.* at 16-17. Stepfather insists that Child's injuries must have "occurred accidentally" on the 15th because if Child was injured before that, his pain "would have been evident[.]" *Id.* at 16. He maintains that when Child showed signs of "distress" on June 15th, he and Mother brought him to the emergency room "immediately." *Id.* Stepfather argues he "acted appropriately at the hospital[,] answered all questions asked of" him, and Child did not display "any fear or anxiety" in his presence. *Id.*

The trial court concluded DHS presented clear and convincing evidence that Stepfather was a perpetrator of child abuse against Child. Trial Ct. Op., 2/13/23, at 4. Specifically, it stated:

> The trial court heard credible clear and convincing evidence from expert witness, [Doctor] Fortin. She testified that Child had unexplained injuries on his abdomen, back, and face. Child's unexplained injuries would not ordinarily be sustained or exist except by reason of the acts or omissions of Stepfather. [Doctor] Fortin also testified that the injuries of Child were not commonly seen with accidental injuries. [Doctor] Fortin's testimony further indicates Stepfather's proposed explanation that the injuries were the result of roughhousing between the children was highly unlikely. . . . Child suffered a severe physical condition evidenced by his need for a feeding tube to receive his nutrition. Moreover, . . . Child's abdominal injuries were so substantial that physicians concluded he had a grade five liver laceration and was pronounced a near fatality.
>
> The trial court heard credible clear and convincing evidence from [DHS Investigator] Brownwether[, who] testified it was unsafe for Child to remain in the home of Stepfather due to the unexplained injuries. Despite Stepfather's insistence that no child abuse occurred, Child clearly indicated Stepfather had hit him resulting in bodily injury to . . . Child's abdomen, face, back, and chin.
>
> The trial court heard credible clear and convincing evidence from [CUA Supervisor] Butler[, who] testified that Stepfather

- 13 -

admitted he was home during the time of the injury, but he gave no valid explanation as to . . . Child's injuries. Stepfather was unable to successfully rebut the presumption that he was [the cause of] Child's abuse. [ ] Child was under the complete care and control of Stepfather and Stepfather's act or failure to act resulted in . . . Child's near fatality.

Lastly, the trial court heard credible clear and convincing evidence from [DHS Investigator] Kreider[, who] testified that one of Child's siblings was home at the time of the injury[ and] disclosed [that] Stepfather and Child were in a room alone and when they exited the room Child had new bruises on his body. This . . . disclosure further indicates Stepfather is unable to rebut the presumption that he caused intentional or reckless bodily injury to . . . Child. Therefore, the trial court found clear and convincing evidence that Stepfather was the perpetrator of the abuse as to [Child].

*Id.* at 5-6.

We agree with the trial court's conclusions. DHS presented clear and convincing evidence that Child suffered injuries that would not have otherwise existed but for the acts or omissions of a parent or person responsible for Child. **See** 23 Pa.C.S. § 6381(d). Stepfather was home caring for Child on June 13th, when Mother reported the first symptoms of Child's injuries — not wanting to eat. Child's symptoms progressed over the next two days, and he was admitted to the emergency room on June 15th. Child's injuries were marked as "near fatality[,]" required him to use a feeding tube, and caused him to remain in the hospital for approximately 44 days. **See** N.T. at 85-86, 95, 102. Neither Mother nor Stepfather provided reasons that could feasibly explain Child's more severe injuries. **See** N.T. at 205-06. The doctor also stated she had "high concern" that Child's injuries were the product of "non-accidental trauma[.]" *Id.* at 101-02.

- 14 -

Further, DHS presented witnesses, which the trial court found credible, who interviewed Child and his siblings. During these interviews, Child and one of his siblings indicated Stepfather was responsible for Child's injuries. *See* N.T. at 26 (Che.L. heard Child "screaming" from an upstairs room, and after "banging" on the door, Stepfather told Che.L. to "shut up" and "mind his business"); 31-32 (Child stating Stepfather "hurt" him and "point[ing] to his stomach"); 49 (Child and his siblings collectively told Mother that Stepfather hurt Child); 55, 138 (Child told hospital and DHS employees that Stepfather hit him); 184 (Che.L. stated Child was in a room with Stepfather and later "had all these bruises on his body that were not there previously"). The extensive evidence DHS presented established a rebuttable presumption of child abuse against Stepfather.

Despite Stepfather's arguments, the trial court was not convinced that he rebutted this presumption. *See* Trial Ct. Op. at 6; *see also* Stepfather's Brief at 17. We agree. We note the siblings initially gave "varying" stories at the hospital as to how Child was injured and in later interviews, like Stepfather, ultimately blamed Che.L.'s "roughhousing" for the injuries. *See* N.T. at 37, 40, 137, 165. However, DHS presented evidence that Mother "coached" the siblings to blame Che.L. for the injuries. *See id.* at 28-29, 40, 49-50, 188-89. Additionally, Che.L. and Child also provided statements which identified Stepfather as the perpetrator. *See id.* at 31-32, 49, 55, 138, 184.

We note that Stepfather deliberately ignores the vast majority of the evidence presented, which does, in fact, point to either his actions or

- 15 -

omissions as the cause for Child's injuries. For instance, he boldly states that DHS "failed to introduce any evidence" that he was responsible for Child's injuries, the evidence "corroborated" his claim that Child had no injuries on June 13th, Child did not experience "distress" until two days later, on the 15th, and he cooperated with DHS's investigation. *See* Stepfather's Brief at 16-17. A review of the testimony establishes otherwise. As discussed *supra*, DHS presented evidence from multiple witnesses, which pointed to Stepfather as the responsible party. *See* N.T. at 31-32, 49, 55, 138, 184. Additionally, Doctor Fortin testified that Child was experiencing symptoms prior to June 15th. *See id.* at 98-99. She noted that Mother reported Child was not eating on June 13th, and the next day, the 14th, he "wasn't himself[,] was laying around[, and] had abdominal pain." *See id.*

The trial court concluded the evidence was credible. *See* Trial Ct. Op. at 5-6. As these determinations are supported by the record, we cannot disturb this credibility finding on review. *See In the Interest of X.P.*, 248 A.3d at 1276.

We agree with the trial court that DHS presented clear and convincing evidence that Stepfather's acts or omissions caused Child's injuries, thus establishing a presumption of child abuse. Further, we agree that Stepfather failed to rebut this presumption. As such, we do not disturb the court's findings on appeal.

Order affirmed.

Judge Dubow Did Not Participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/9/2023