J-S09002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.B.-W. AND D.A.-S., MINOR CHILDREN | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: V.A., MOTHER | : : : : : : : | |
| | : | No. 1355 EDA 2021 |

Appeal from the Order Entered June 25, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001116-2020,
CP-51-DP-0001268-2020

BEFORE:   LAZARUS, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED JULY 1, 2022**

V.A. (Mother) appeals from the trial court's order, entered in the Court of Common Pleas of Philadelphia County, on two separate dockets,[1] after a finding of dependency, the existence of aggravating circumstances, and a determination that Mother is a perpetrator of child abuse.  After careful review, we affirm.

These dependency actions arose from the death of Mother's four-year-old child, A.A., while in the care of Mother's older child, ten-year-old N.B.-W. (born 12/2009).  In September 2020, Mother was admitted to the hospital due to pregnancy complications.  During her month-long hospital stay, Mother left A.A., who suffered from, among other conditions, cerebral palsy and

---

[*] Former Justice specially assigned to the Superior Court.

[1] **See** CP-51-DP-1268-2020 and CP-51-DP-1116-2020.

needed a medically-trained caregiver to attend to his needs full-time, in the care of E.S. (Stepfather)[2] and N.B.-W., who were living in an Extended Stay Hotel. Mother testified that, although she left A.A. primarily in Stepfather's care, she did so knowing that Stepfather was not a trained caregiver for A.A.'s significant medical needs and that Stepfather had to work outside of the home three days a week. As a result of Stepfather's work schedule, N.B.-W. ended up caring for A.A. for ten to twelve hours a day for up to four days a week.

On the day that Mother was discharged from the hospital, Stepfather left the hotel to pick her up and did not return until more than five hours later, leaving N.B.-W. alone to care for A.A. Mother and Stepfather decided to go to a restaurant for dinner before returning home after Mother's discharge. When Mother entered the hotel room, she found A.A. unresponsive; she immediately administered CPR, unsuccessfully, to A.A. Stepfather then called 9-1-1. An autopsy performed on A.A. listed his cause of death as aspiration pneumonia due to his cerebral palsy, as well as a respiratory, viral infection. Experts could not agree on A.A.'s manner of death.

_____

[2] In October 2020, Mother gave birth to another child, D.A.-S, A.A.'s and N.B.-W.'s half-brother. A.A. and N.B.-W. are also half-siblings with different biological fathers. E.S. is Mother's paramour. Although E.S. is the stepfather of A.A. and N.B.-W., and D.A.-S.'s biological father, for ease of reference we refer to him as Children's "Stepfather" for purposes of this appeal. Stepfather was also found to be a perpetrator of child abuse. He filed a separate appeal from the trial court's June 25, 2021 order. Our Court affirmed the trial court's order on appeal. **See In the Interest of N.B.-W.**, 1351-1354 EDA 2021 (Pa. Super. filed Feb. 23, 2022) (unpublished memorandum decision).

On October 6, 2020, the Philadelphia Department of Human Services received a general protective services report (GPS) alleging that N.B.-W. had been left alone to care for his four-year-old, medically needy brother, A.A., for extended periods of time, three to four days a week. On October 9, 2020, DHS received a child protective services (CPS) report alleging that Stepfather left N.B.-W. and A.A. alone when he went to pick Mother up at the hospital following her discharge and, upon their return home, A.A. was deceased.

DHS obtained an order of protective custody (OPC) for Mother's two other children, N.B.-W. and D.A.-S. (collectively, Children), finding that it would not be in Children's best interests to remain in Mother's care. Children were removed from Mother's care and placed in kinship care with maternal uncle. Mother was permitted to have weekly supervised visits with Children at the agency; visitation was modifiable by agreement of the parties. The placement goal remained return to parent.

On November 25, 2020, the court held a shelter care hearing, after which the OPC was lifted and Children were temporarily committed to DHS. Children remained in maternal uncle's care. On December 4, 2020, DYS filed a dependency petition. On June 25, 2021, a virtual adjudicatory and child abuse hearing was held before the Honorable Vincent W. Furlong. At the hearing, the court heard testimony from Dr. Renee Turchi, Dr. Lindsay Simon, Ms. Tierra Dunn, Mother, and Stepfather.

Doctor Turchi, a Pediatrician-in-Chief and Medical Director of the Center for Children and Youth with Special Healthcare Needs at St. Christopher's

Hospital for Children, was recognized as an expert in pediatric medicine. N.T. Adjudicatory/Abuse Hearing, 6/25/21, at 11-12. Doctor Turchi testified that she treats children with medical complexities, works with grants related to children's special needs in conjunction with home care and coordination and, most relevantly, was one of the doctors in the pediatric practice treating A.A. "shortly after he came out of the NICU [and for] his entire life." *Id.* at 13.

Doctor Turchi testified that A.A. had been born with a condition known as "small gestational age," had underlying brain abnormalities, a cystic lesion in part of his cerebellum, hydrocephalus, cerebral palsy, seizures, difficulty swallowing, vision problems, moderate asthma with underlying chronic lung disease, eczema, global developmental delay, and hip issues. *Id.* at 14-15. After undergoing surgery to "tighten" his stomach in order to prevent regurgitation and aspiration, A.A. had a feeding tube inserted in 2017. *Id.* at 14. Special formula and medications were released through the feeding tube at specified intervals four to five times a day; A.A. required the assistance of someone trained in the specialized care associated with an individual using a feeding tube. *Id.* at 15, 17, 19-20. Doctor Turchi testified that A.A. required the care of at least ten specialists at various times in his life to manage his conditions and medications. *Id.* Finally, Dr. Turchi testified that A.A. required a trained caregiver and skilled nursing to meet his around-the-clock medical needs and that a 10-year-old would not be an appropriate caregiver for A.A. *Id.* at 24, 29-30.

Doctor Simon, an Associate Medical Examiner for the Philadelphia Medical Examiner's Officer, who was qualified as a medical examiner, testified that she performed A.A.'s autopsy and determined that A.A.'s cause of death was aspiration pneumonia, due to his cerebral palsy, and that A.A.'s manner of death was undetermined.[3] *Id.* at 41. Specifically, Dr. Simon testified that, in her opinion, A.A.'s manner of death was not by accident, *id.* at 43, that she could not "say with certainty"[4] if A.A.'s manner of death was homicide or from natural causes, *id.* at 42, but that A.A.'s manner of death was not suicide. *Id.* Doctor Simon, however, stated that "the circumstances surrounding [A.A.'s] death . . . concern[ed] her with regard to] the possibility of neglect contributing to his death." *Id.* at 43.

DHS investigator and social worker, Tierra Dunn, testified that she prepared a CPS report noting that Mother told her that Stepfather and N.B.-W. had been taking care of A.A. while she was in the hospital for approximately one month.[5] *Id.* at 54. Ms. Dunn also testified that the CPS report noted that ten-year-old N.B.-W. was left alone to care for his "medically needy sibling [A.A.] for 10 to 12 hours a day, three to four days out of the week" when

_____

[3] In Pennsylvania there are five possible manners of death: natural causes, accident, suicide, homicide, and undetermined. *Id.* at 41.

[4] Doctor Simon testified that with regard to determining a manner of death, "the threshold of certainty that [she] need[s] is just more likely than not – 51 percent chance that this is what I think it is." *Id.* at 46.

[5] Mother was hospitalized between September 6, 2020 to October 9, 2020, due to pregnancy complications.

Mother was in the hospital. *Id.* at 55. Mother told Dunn that while she was in the hospital, she was instructing N.B.-W., via FaceTime, about how to administer A.A. his medications, feed him, and change his diapers. *Id.* at 59-61.[6] However, Mother also testified that she would not have been able to tell over the video if A.A. had a fever, was clammy, had been urinating less or had fewer stools than normal. *Id.* at 100. Dunn testified that she sought an OPC in order to effectuate a safety plan for Mother's other children while CYS investigated the events surrounding A.A.'s death. *Id.* at 71. Over Mother's objection, N.B.-W. and D.A.-S were removed from the Mother's care while the investigation took place.

Dunn testified that Stepfather told her he was not trained to care for A.A. and that he felt "N[.B.-W.] had watched [M]other more than enough times to give the medications, the feedings[,] and to change A[.A.]" *Id.* at 73, 78. Finally, Dunn testified that on the day he died, A.A. had been left unsupervised for five and one-half hours and that that amounted to neglect. *Id.* at 75-76. Dunn ultimately determined that the CPS report was indicated with regard to Mother and Stepfather as perpetrators of abuse toward A.A due to their failure to provide appropriate medical treatment and care to A.A.,

---

[6] Mother told Dunn that, prior to COVID, she had a nurse caring for A.A. during the day. *Id.* at 62.

which included leaving a 10-year-old to care for A.A., and the failure to supervise both A.A. and N.B.-W. for days. *Id.* at 79-80.[7]

At the hearing, Mother testified that she was the only individual appropriately trained to care for A.A. *Id.* at 93. Mother also testified that for the month that she was in the hospital, she believed that Stepfather was A.A.'s caregiver despite the fact that Mother knew Stepfather never had any medical training to care for A.A., and that Stepfather only had "some experience with diapers and his feeding tube." *Id.* at 98, 101-02. Mother testified that when she was in the hospital, she was told that "people that lived in the Extended Stay [Hotel] . . . w[ere] keeping an eye on [A.A. and N.B.-W.]." *Id.* at 102-03. However, Mother admitted that no one at the hotel knew how to attend to A.A.'s specialized medical needs, *id.* at 104, and that no one at the hotel had been provided the contact information for A.A.'s primary care doctor. *Id.*

Stepfather was the last witness to testify at the hearing. He testified that on the day of A.A.'s death, he had asked an Extended Stay Hotel employee and a friend to look in on A.A. and N.B.-W. and that he had previously asked people at the hotel to check on the children. *Id.* at 110-11. Stepfather admitted that he was not medically trained to care for A.A. *Id.* at 111, 115. Stepfather testified that he left N.B.-W. alone with A.A. when he

---

[7] Dunn also observed N.B.-W.'s forensic interview at Philadelphia Children's Alliance in which he explained how he gave A.A. his medication, fed him, and had to "pamper" his brother while Mother was in the hospital. *Id.* at 69. N.B.-W. also told the forensic interviewer that on the days Stepfather worked, he would be "gone for hours at a time." *Id.*

went to pick Mother up at the hospital. Stepfather was gone for over five hours, taking Mother out to dinner on the way home from the hospital because he "just wanted to go out and have a good time and have dinner." *Id.* at 114.

At the end of the hearing, the trial court concluded A.A. died by neglect,[8] and, accordingly, entered an order adjudicating N.B.-W. and D.A.-S. dependent pursuant to 42 Pa.C.S. § 6302(1),[9] finding that A.A. was the victim of child abuse at the hands of Mother and Stepfather under 23 Pa.C.S. §§ 6303, 6381(d), and determining that aggravating circumstances existed. *See* 42 Pa.C.S. § 6341. The court found neither Mother nor Stepfather credible, but found DHS' witnesses credible. N.T. Adjudicatory/Abuse Hearing, 6/25/21, at 127. Children were ordered to remain in kinship care; however, the placement goal remained reunification with Mother. In its Pa.R.A.P. 1925(a) opinion, Judge Furlong emphasized his findings:

> The facts of this case are shocking. The slow[,] agonizing death of [A.A.] was clear and convincing evidence of child abuse. Mother's lack of attention to [A.A.'s] medical needs was appalling. Mother never sought adequate medical care for [A.A.,] but decided to place [A.A.] in the care of an irresponsible [Stepf]ather and her [c]hild[,] N.B.-W.[,] who was placed in an unreasonable position by [] Mother. []N.B.-W. is not at fault in this circumstance and there is no evidence to suggest that he abandoned his younger brother. The argument that Mother was not accorded due process in the virtual court trial where she had an opportunity to testify and was represented by counsel is meritless. The

---

[8] *See id.* at 128-29.

[9] *See* 42 Pa.C.S.§ 6302 (1) (child without proper care or control, subsistence, education as required by law, or other care or control necessary for physical, mental, or emotional health, or morals).

testimony of Mother, [Stepf]ather, Dr. Tuchi[,] and Dr. Simon[, who were] all subject to cross-examination by counsel[,] was enough to adjudicate the Children dependent and to make a finding of child abuse and aggravated circumstances against Mother.

Trial Court Opinion, 12/22/21, at 14.

Mother filed a timely notice of appeal[10] and court-ordered Rule 1925(b) concise statement of errors complained of on appeal. Mother presents the following issues for our consideration:

(1)   Did the trial court err and/or abuse its discretion by making a finding of dependency where the testimony and evidence presented did not support such a finding and DHS failed to prove the same by clear and convincing evidence?

(2)   Did the trial court err and/or abuse its discretion by making a finding of aggravated circumstances where the testimony and evidence presented did not support such a finding and DHS failed to prove the same by clear and convincing evidence?

(3)   Did the trial court commit an error of law and/or abuse its discretion by attributing evidence of abuse and/or neglect as it relates to A.A., towards N.B.-W. and D.A.-S, when the

_____

[10] Mother erroneously filed one notice of appeal listing the trial court's two dependency docket numbers in violation of **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), which held that "when 'one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeals must be filed.'" **Id.** at 976. On May 25, 2022, this panel remanded the case to the trial court to permit counsel to file, *nunc pro tunc*, separate, amended, corrective notices of appeal in each dependency action in compliance with **Walker** as per our Supreme Court's directive in **Commonwealth v. Young**, 265 A.3d 462, 477-78 (Pa. 2021), which held that where a timely appeal is erroneously filed at only one docket, Pa.R.A.P. 902 permits the appellate court, in its discretion, to allow for a correction of error, where appropriate. **See In the Interest of:  N.B.-W. and D.A.-S.**, No. 1355 EDA 2021 (Pa. Super. filed May 25, 2022) (unpublished memorandum decision). Mother filed corrective notices of appeal, and, thus, this case now returns to us for disposition on the merits.

latter children are not similarly situat[ed] in that they do not present the same medical difficulties nor require the same level of care as A.A.

(4)     Did the trial court commit an error of law and/or abuse its discretion by making a finding of child abuse as it relates to the minor children, N.B.-W. and D.A.-S., where the testimony and evidence presented did not support such a finding and DHS failed to prove the same by clear and convincing evidence?

(5)     Did the trial court commit an error of law and/or abuse its discretion by failing to provide [Mother] with an in-person hearing instead of a virtual hearing, thus violating [Mother's] due process rights to fundamental fairness?

Appellant's Brief, at 4-5 (renumbered for ease of disposition).

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). "[Although] dependency proceedings are governed by the Juvenile Act (Act), . . . the Child Protective Services Law (CPSL) . . . controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence."

*In re L.V.*, 209 A.3d 399, 417 (Pa. Super 2019) (citations omitted); *see also*

*In the Interest of X.P.*, 248 A.3d 1274, 1276 (Pa. Super. 2021) (same).

Mother asserts that the trial court improperly adjudicated Children dependent where "there was little to no evidence that [Children] met the statutory definition of dependency [and] where DHS based [its] entire theory of dependency for [C]hildren on the circumstances surrounding the death of their sibling, A.A." Appellant's Brief, at 13. Mother contends that there was

"almost no evidence" to demonstrate that either N.B.-W. or D.A.-S. "lacked proper parental care or control." *Id.* This argument is not only specious, but borders on ludicrous based on the tragic circumstances of this case.

To adjudicate a child dependent, a trial court must determine, by clear and convincing evidence, that the child

> (1) **is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals.** A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

*In the Interest of A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013) (emphasis added), citing 42 Pa.C.S. § 6302 (Act's definition of "dependent child").

Mother knowingly left ten-year-old N.B.-W., for prolonged periods of time, alone at home and tasked with caring for his four-year-old brother who required around-the-clock specialized medical care. Mother's poor parenting judgment as it relates to A.A.'s and N.B.-W.'s wellbeing more than supports the court's dependency adjudications. Mother knew that N.B.-W. was not only unqualified to care for his toddler brother, but was just a child himself, whom she knowingly left alone at home without any parental supervision for at least thirty hours per week. Moreover, based on Mother's lack of judgment and inappropriate decision-making as it related to A.A. and N.B.-W, there was clear and convincing evidence to support an adjudication of dependency for

D.A.-S., a newborn, who would be entirely dependent upon Mother for her care.[11]

Mother next argues that there is no evidence of record to support a finding that she was the perpetrator of child abuse with regard to A.A. Specifically, Mother asserts that there was no evidence that she "acted intentionally, knowingly, or recklessly as it relates to the unfortunate death of A.A." *Id.* at 10. Moreover, she claims that the finding of abuse was erroneous because no expert definitively stated A.A.'s manner of death "was attributable to inexcusable neglect on the part of Mother," *id.* at 18, but, rather, that "the expert testimony and forensic report demonstrate that [A.A.'s] cause of death was attributable to his several comorbidities." *Id.* at 10.

The CPSL defines "child abuse," in relevant part, as follows, "[t]he term 'child abuse' shall mean intentionally, knowingly or recklessly . . . [c]ausing serious physical neglect of a child . . . or [c]ausing the death of the child through any act or failure to act." 23 Pa.C.S. §§ 6303(b.1)(7), (9). "Serious physical neglect" is defined under the CPSL as

---

[11] Moreover, having concluded that the trial court properly found Mother was a perpetrator of abuse to A.A., *see infra* at 12-14, the trial judge's decision to adjudicate N.B.-W. and D.A.-S. as dependent is supported by the record. *See in re R.P.*, 957 A.2d 1205, 1213 (Pa. Super. 2008) (stating that where trial court finds one sibling dependent due to abuse, court may determine other siblings also dependent, even if they have not been abused); *see also In re G.T.*, 845 A.2d 870, 874 (Pa. Super. 2004) (parent's failure to provide proper parental care and control to child may necessitate adjudication of dependency for child's siblings where parental failure places siblings at risk of physical, mental, or emotional harm).

> Any of the following when committed by a perpetrator that endangers a child's life or health, threatens a child's well-being, causes bodily injury or impairs a child's health, development or functioning:
>
> > (1) A repeated, prolonged or egregious failure to supervise a child in a manner that is appropriate considering the child's developmental age and abilities.
> >
> > (2) The failure to provide a child with adequate essentials of life, including food, shelter or medical care.

*Id.* at § 6303.

It defies credibility that Mother claims she "did everything in her power to provide care for A.A. until his death." Appellant's Brief, at 18. Incontrovertible evidence proved that Mother knowingly left her ten-year-old son, for more than 30 hours a week for almost one month, alone at home and in charge of caring for his four-year-old brother who required around-the-clock medical care. We would be hard-pressed to find circumstances more indicative of serious physical neglect than those in the instant case. Moreover, contrary to Mother's contentions, A.A. *was* left in his brother's care "for prolonged periods of time" and the experts *did agree* that A.A. required around-the-clock care and supervision. *Id.* at 18. *See* N.T. Adjudicatory/Abuse Hearing, 6/25/21, at 15, 17, 19-20, 24, 29-30, 55, 75-76, 93, and 114. *See also id.* at 43 (Dr. Simon opining that leaving A.A. in primary care of ten-year-old brother for extended period of time would have been type of neglect that could have contributed to A.A.'s death and that it "is not a standard of medical care").

Moreover, it is of no moment that "A.A. was not in the care of Mother at the time of his death [or] . . . in the care of Mother for approximately [one] month prior to his death," Appellant's Brief, at 17-18; Mother did not need to be present when A.A. died in order to be deemed a perpetrator of abuse. *See In the Interest of C.B.*, 264 A.3d 761, 773 (Pa. Super. 2021) (en banc) ("Under section 6381 of the CPSL, a petitioning party is not required to establish that the parent or caregiver perpetrated the abuse 'intentionally, knowingly[,] or recklessly.' Rather, in section 6381 cases, 'the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible,' permitting petitioners to 'prove their case with only physical evidence of injuries that would not ordinarily be sustained but for the action [or inaction] of the parents or responsible persons and the implausible statements of the parents and responsible persons.'").

Under section 6381, *prima facie* evidence existed to sustain a finding of abuse and Mother failed to rebut that presumption where A.A.'s death was not deemed accidental and where Mother admitted neither Stepfather nor N.M.-W., whom she left to care for A.A. for one month, were specially trained caregivers. *See In the Interest of L.Z.*, 111 A.3d 1164, 1167, 1185 (Pa. 2015) (parent or caregiver can rebut section 6381(d) *prima facie* presumption with evidence that victim's injuries were accidental, rather than abusive, or with evidence "[d]emonstrating that the parent or responsible person did not inflict the abuse, potentially testifying that they gave responsibility for the child to another person about whom they had no reason to fear"). Under

these circumstances, we conclude that the trial court appropriately concluded Mother was a perpetrator of abuse, where Mother's actions or failure to act caused A.A.'s death and N.B.-W. to suffer serious physical neglect.

Mother next argues that DHS failed to prove, by clear and convincing evidence, that N.B.-W., D.A.-S., and A.A. were victims of physical abuse resulting in serious bodily harm, which is a requirement for a finding of aggravated circumstances. Mother claims that aggravating circumstances were not proven because A.A.'s primary care physician was not concerned as to the level of care he received from Mother during his life and because the medical examiner did not notice any signs of physical injury or harm to A.A., but, rather, A.A. appeared to die of natural causes.

The Act defines "aggravated circumstances," in part, as "[t]he child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence, or aggravated physical neglect by the parent." 42 Pa.C.S. § 6302(2). "Aggravated physical neglect" is defined under the Act as "[a]ny omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." *Id.* Here, there was clear and convincing evidence to establish that N.B.-W.'s and D.A.-S.'s sibling, A.A., was the victim of aggravated physical neglect where Mother left four-year old A.A., who suffered from significant medical infirmities requiring around-the-clock care, without an appropriate caregiver for weeks, ultimately resulting in his death. Thus, we find no merit to this claim.

Finally, Mother asserts that she was deprived of due process where the dependency/abuse hearing was held virtually,[12] rather than in-person, and where her "counsel had a conflict due to another [court] appearance after two hours into the hearing, [and] the trial court refused to excuse him and offer a bifurcated hearing." Appellant's Brief, at 19.[13]

Mother admits that, at the time that counsel had to excuse himself from the hearing, the experts had already testified. Moreover, Mother never explains exactly how she was deprived of due process or how a continuance for an in-person hearing would justify further delay in the matter. Notably, Mother never asked for a continuance or an in-person hearing. In fact, the only evidence in the record on this issue consists of Mother's counsel telling the trial judge that the Municipal Court was "waiting on [him]." N.T Adjudicatory/Abuse Hearing, 6/25/21, at 104. When the trial judge told counsel that "you're going to have to handle that because you're not excused,"

_____

[12] As DHS notes in its brief, on March 16, 2020, the president judge of the First Judicial District obtained a relief order from the Supreme Court that provided, in part, for the authorization of expanded use of "advanced communication technology" to conduct court proceedings due to the COVID-19 public health emergency in Philadelphia County. DHS' Brief, at 26 n.9, citing No. 17 EM 2020 (emergency judicial order).

[13] Mother also claims additional procedural irregularities due to the virtual nature of the hearing. However, she did not preserve those sub-issues in her Rule 1925(b) statement. *See* Rule 1925(b) Statement, 6/2/22, at 1-2 ("The Trial Court erred and/or abused its discretion by failing to provide [Mother] with a bifurcated hearing[,] thus violating [Mother's] due process rights to fundamental fairness."). *See also* Pa.R.A.P. 1925(b)(3)((iv)("any issue not properly included in the Statement timely filed and served pursuant to subdivision (b) shall be deemed waived").

*id.*, counsel replied, "Thank you, Your Honor" and then indicated that he had "[n]othing further." *Id.* Thus, we find that Mother has waived this challenge. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). Moreover, even if Mother had not waived this issue, as the trial court notes, Mother was afforded all the required due process/procedural safeguards, including notice of the hearing, representation by counsel, the opportunity to be heard, the chance to defend herself during the hearing, and the ability to cross-examine witnesses.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/1/2022