J-A16035-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.A., JR., FATHER | : | No. 117 MDA 2023 |

Appeal from the Order Entered March 10, 2022
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000191-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: E.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.A., JR., FATHER | : | No. 118 MDA 2023 |

Appeal from the Order Entered March 10, 2022
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000188-2020

BEFORE:   PANELLA, P.J., BENDER, P.J.E., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                   **FILED AUGUST 28, 2023**

In this dependency matter, following a remand by this Court, E.A. Jr.,

(Father) appeals *nunc pro tunc*[1] from the order entered March 10, 2022, in

_____

[1] Father did not initially file a notice of appeal, but on April 22, 2022, filed a petition to reinstate his appeal rights *nunc pro tunc*.  The trial court denied relief.  Father appealed, and appellees, the York County Offices of Children, Youth, and Families (CYF) and the children's guardian *ad litem*, agreed that relief should be granted.  On December 16, 2022, another panel of this Court reversed the trial court's denial order and remanded for the reinstatement of Father's direct appeal rights and appointment of new counsel.  We note that memorandum was prepared by this same author. ***See Interest of E.A.***, 782 & 783 MDA 2022 (unpub. memo.) (Pa. Super. Dec. 16, 2022).

*(Footnote Continued Next Page)*

the York County Court of Common Pleas, finding him to be a perpetrator of child abuse[2] with respect to two of his children, B.W. (born in May of 2014), and E.A. (El.A.,[3] born in August of 2019). Father presents several arguments challenging the weight of the evidence presented.[4] We affirm.

## I. Introduction

In addition to B.W. and El.A., Father and Mother (collectively, the Parents) are the parents of Ed.A. (born in June of 2015), R.A. (June of 2018), and A.A. (June of 2021) (collectively, the Children). Both Parents have several appeals currently pending before this Court, as follows.

First, we summarize that on January 13, 2022, the trial court changed the permanency goals for all five Children from reunification to adoption. The Parents' appeals therefrom are docketed before a different panel of this Court at Dockets 201 through 205 MDA 2022 (Father's appeals) and 295 through 299 MDA 2022 (Mother's appeals). On October 12, 2022, the panel issued

_____

As we discuss **infra**, the children's mother, T.W.A. (Mother), was also found to be a perpetrator of child abuse on March 10, 2022. Her timely appeal to this Court was affirmed on December 28, 2022. **Interest of B.W.**, 545 & 546 MDA 2022 (unpub. memo.) (Pa. Super. Dec. 28, 2022).

[2] **See** 23 Pa.C.S. § 6303 (defining "perpetrator" as, inter alia, a parent who has committed child abuse against their child).

[3] As Father and Mother have two children with the initials, "E.A.," we will refer to the child E.A. as "El.A." and the child, E.A., III, as "Ed.A."

[4] CYF and the Children's guardian ad litem have filed a joint appellee's brief in support of affirmance.

one order staying all of these appeals, pending the resolution of the Parents' additional appeals.

Meanwhile, on March 10, 2022, the trial court entered the underlying order, finding both parents were perpetrators of abuse as to B.W. and El.A. This memorandum addresses Father's appeal from that order. As noted above, Mother has also appealed, and this Court affirmed on December 28, 2022. *Interest of B.W.*, 545 & 546 MDA 2022.

Finally, on April 18, 2022, the trial court involuntarily terminated both Parents' rights to all five Children. Both parents have also appealed from those orders, at this Court's Dockets 683 through 687 MDA 2022 (Father) and Dockets 755 through 759 MDA 2022 (Mother). Additionally, Counsel for El.A. and R.A. have appealed from the termination orders, at, respectively, Dockets 740 and 741 MDA 2022. On December 8, 2022, this Court likewise stayed all of these appeals pending resolution of, *inter alia*, Father's instant appeal.

## II. Facts & Procedural History

In August of 2020, CYF received a referral, which alleged Parents were using heroin and not properly supervising the four older children, B.W. (then six years old), Ed.A. (five), R.A. (two), and El.A. (one). These children were adjudicated dependent on September 16, 2020. The trial court established the Children's permanency goal as return to parent, and conducted ongoing shelter care, status review, and permanency review hearings. A.A. was born

in June of 2021 and was adjudicated dependent the following month, on July 12, 2021.

Meanwhile, on December 29, 2020, CYF received a Child Protective Services (CPS) referral as to the alleged physical abuse of B.W., then approximately six years old, by Mother and Father. N.T., 3/10/22, at 23. At the time, B.W. was residing in a foster home. *Id.* at 38-39. CYF conducted a "minimal facts" interview,[5] at which B.W. disclosed physical abuse by Mother and Father. *Id.* at 26.

On January 26, 2021, Lauren Carter, a forensic interviewer with the York County Children's Advocacy Center (CAC), conducted a forensic interview of B.W. *See* N.T., 3/10/22, at 10, 26. CYF Caseworker Marshall, as well as law enforcement, observed this forensic interview.[6] N.T., 3/10/22, at 27. B.W. disclosed he, as well as his siblings, were physically abused by both Parents. His statements led to a referral alleging the Parents' abuse of El.A.

At a status review hearing on November 10, 2021, the Parents averred the "the criminal investigation [of their alleged abuse] has been ongoing for quite some time[, but] has gone nowhere[.]" N.T., 11/10/21, at 8-9. The trial court directed CYF to conduct an independent investigation and to provide

---

[5] CYF Caseworker Kristen Marshall described this interview as a focus on "who, what, when, where." N.T., 3/10/22, at 25.

[6] Caseworker Marshall explained that when CYF receives a CPS referral, CYF must notify the police. N.T., 3/10/22, at 27.

a finding of "indicated" or "unfounded" by the next hearing in three months' time.  *Id.* at 8-9; Status Review Order, 11/10/21.

At the next permanency review hearing, on January 11, 2022, CYF reported it found both Mother and Father indicated as perpetrators of physical abuse against both El.A. and B.W., for causing bodily injury.  N.T., 1/11/22, at 7.  Furthermore, with respect to El.A. only, both Parents were indicated for striking a child under the age of one.  *Id.* at 6-7.  On that same day, the trial court changed all the Children's permanency goals to adoption with the concurrent goals noted as return to parent or guardian.[7]

### III.  March 10, 2022, Finding of Abuse Hearing

Next, on March 10, 2022, the trial court conducted a finding of abuse hearing.  Mother and Father were present and represented by counsel, but did not testify.  The Children were excused from attending the hearing, but were represented by a guardian *ad litem* and separate legal counsel.  N.T., 3/10/22, at 4.   CYF called CAC forensic interviewer, Ms. Carter, as well as CYF Caseworker Marshall, to testify about B.W.'s forensic interview.   We now review their testimony in detail.

First, Ms. Carter, testified to the following.  B.W., who was six years old at the time of the interview, was able to distinguish the difference between a

---

[7] As stated above, both Parents have appealed from these goal change orders.  ***See*** 201 through 205 MDA 2022 (Father); 295 through 299 MDA 2022 (Mother).

truth and a lie, and he appeared to have normal cognitive functioning. N.T., 3/10/22, at 10, 14. B.W. disclosed: he and El.A. were "being beat;" Mother slapped him; El.A. "was slapped with a belt;" Father "beat" R.A.; and Mother slapped both El.A. and R.A. *Id.* at 12. With respect to whether B.W. had been "coached" ahead of the interview, Ms. Carter denied it was "her job to determine if someone's being coached[,]" and instead, she merely "gather[ed] information." *Id.* at 19. While she could not say whether B.W. had been coached, she did not "recall anything that would [suggest] that during [B.W.'s] interview." *Id.* at 14, 19. Finally, Ms. Carter conceded she had not reviewed the video of the interview, but confirmed her written summary of the interview was accurate. *Id.* at 13, 18. Ms. Carter also stated that in Ed.A.'s separate forensic interview that same day, Ed.A. revealed: there **was** "physical abuse occurring in the home[;]" but there was no indication either parent was slapping the children or hitting them with belts. *Id.* at 14.

CYF Caseworker Marshall, who observed the forensic interview, testified:

> [B.W.] disclose[d] that [he] and his siblings were being punished with . . . a black belt with little spikes on it. He reported that it was hurtful. [B.W.] actually stated it hurt more than a gun. He stated . . . the spikes were sharp and caused him to bleed. He stated he would cry and . . . and he was hit over and over. The very red marks like — were left like it was bleeding, but it wasn't. And he stated that both parents would hit him. . . .

N.T., 3/10/22, at 28-29. Caseworker Marshall sought, but did not receive, medical records that might show physical injury to B.W. ***See id.*** at 31; Trial Ct. Op., 6/6/22, at 10.

With respect to El.A., Caseworker Marshall testified that B.W. stated Mother and Father "sometimes . . . slapped [El.A.], so there was blood under his tongue, and that [El.A.] would cry a lot and neighbors would hear." N.T., 3/10/22, at 29. "An investigation revealed [El.A. was] taken to the York Hospital emergency room for bleeding from the mouth in August 2019 when he was less than a month old." Trial Ct. Op., 3/4/22, at 3-4. Caseworker Marshall "attempted multiple times" to schedule an interview with Mother and Father, but was unsuccessful. N.T., 3/10/22, at 31-32.

CYF entered into evidence the forensic interview summary[8] and a DVD video of B.W.'s forensic interview. However, the trial court declined to play the video, stating,

> . . . I don't see any reason to play it in open court. That's not going to accomplish anything. Counsel have already seen it,

---

[8] Ms. Carter described a forensic interview summary as including:

> basic demographic information, [who was] present for the interview, who brought the child to the center, as well as who observed the interview. It includes who the alleged perpetrators are, a brief section about the child's functioning during the interview, and then a brief summary of what was said in the interview.

N.T., 3/10/22, at 11.

they've asked their questions, we have the summary [of the forensic interview.[9]]

N.T., 3/10/22, at 21-22.

Finally, relevant to Father's arguments in this appeal, we note that a forensic interview of another sibling, Ed.A. was conducted on the same day as B.W.'s interview, January 26, 2021. This interview did not reveal any physical abuse against Ed.A., although there was "indication that physical abuse was occurring in the home[.]" N.T., 3/10/22, at 15. Neither this interview nor the ensuing summary report was presented as evidence at the finding of abuse hearing.

At the conclusion of the hearing, the trial court rendered a finding that both Father and Mother were perpetrators of abuse against B.W. and El.A. N.T., 3/10/22, at 53-54.

As noted above, the trial court initially denied Father's petition to reinstate his appeal rights *nunc pro tunc*. However, on appeal, another panel of this Court reversed, remanding the case and directing the reinstatement of Father's appeal rights and appointment of new counsel. ***Interest of E.A.***,

_____

[9] In its opinion, the trial court stated it subsequently viewed the video, "within the period when orders may be modified or rescinded." Trial Ct. Op., 2/16/23, at 9 n.1. The court, however, determined "no modification of the order was necessary." ***Id.***

782 & 783 MDA 2022. Father has filed separate notices of appeal[10] and the trial court issued a new opinion on February 16, 2023.

## IV. Statement of Question Involved & Standard of Review

On appeal, Father presents the following issue for our review:

Whether or not the lower court erred when it entered a finding of abuse against [Father] without clear and convincing evidence.

Father's Brief at 4.

At this juncture, we note the applicable standard of review:

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record[] but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*Interest of R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citations omitted).

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we

---

[10] Although the trial court entered a single order containing separate captions for B.W. and El.A., Father filed separate notices of appeal. He has thus complied with *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018) (when a single order resolves issues arising on more than one trial court docket, separate notices of appeal must be filed for each case), *overruled in part*, *Commonwealth v. Young*, 265 A.3d 462, 477 (Pa. Dec. 2021) (reaffirming that Pa.R.A.P. 341 requires separate notices of appeal when single order resolves issues under more than one docket, but holding Pa.R.A.P. 902 permits appellate court to consider appellant's request to remediate error when notice of appeal is timely filed).

may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

[W]e must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon. . . . Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court. . . .

*Interest of R.J.T.*, 9 A.3d at 1190.

## V. Father's Issue: Finding of Abuse

On appeal, Father avers the trial court erred in finding he is a perpetrator of abuse, where there was no clear and convincing evidence. Father maintains that "[a]n indicated finding must be based on substantial evidence supported by an admission, corroborating medical evidence, or the Agency's investigation." Father's Brief at 13. He provides the following evidentiary arguments. First, with respect to B.W., CYF pursued a finding of abuse based solely on the disclosures B.W. made, when he was six years old. *Id.* However, the finding of abuse hearing was not conducted until 13 months later, and the forensic interview was not played in court. *Id.* CYF presented no medical evidence as to B.W., any admission by the parents, photographs, nor, "importantly, [any] consistent and credible statements by" B.W. *Id.* at 14. Furthermore, Caseworker Marshall testified that B.W. told her "both parents would hit him, but Daddy would do less hits[.]" *Id.* at 8.

With respect to El.A., Father acknowledges CYF did introduce a medical report, but emphasizes it indicated a "low suspicion of child abuse." Father's Brief at 14. El.A. did not testify at the hearing. *Id.* Although B.W. stated in his interview that El.A. was bleeding from the mouth, when Ms. Carter asked B.W. who caused this injury, the response was merely, "[T]hey beat" El.A. *Id.* at 7. Finally, Father recounts that while Ed.A. also underwent a forensic interview, "there was no disclosure regarding Mother of Father slapping the children." *Id.* After careful review, we determine no relief is due.

This Court has explained:

> While dependency proceedings are governed by the Juvenile Act . . . the Child Protective Services Law . . . pertains to a court's finding of "child abuse," which must be supported by clear and convincing evidence. [A]s "part of [a] dependency adjudication, a court may find a parent to be the perpetrator of child abuse," as defined by the CPSL.

*Interest of X.P.*, 248 A.3d 1274, 1276 (Pa. Super. 2021) (citations omitted).

The CPSL defines child abuse, in relevant part, as follows:

> **(b.1) Child abuse.** The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
>> (1) Causing bodily injury to a child through any recent act or failure to act.
>
>> \* \* \*
>
>> [(8)(iv)] Forcefully slapping or otherwise striking a child under one year of age. . . .

- 11 -

23 Pa.C.S. § 6303(b.1)(1), (8)(iv). Bodily injury, in turn, is defined as "[i]mpairment of physical condition or substantial pain."[11] 23 Pa.C.S. § 6303(a).

In its latest opinion, issued after the remand by this Court, the trial court addressed Father's issues. First, with respect to the passage of 13 months

_____

[11] Furthermore, with respect to the definitions of intentionally, knowingly, and recklessly, the definitional section of the CPSL refers to 18 Pa.C.S. § 302(b), which provides:

(1) A person acts intentionally with respect to a material element of an offense when:

(i) . . . it is his conscious object to engage in conduct of that nature or to cause such a result; and

(ii) . . . he is aware of the existence of such circumstances or he believes or hopes that they exist.

(2) A person acts knowingly . . . when:

(i) . . . he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) . . . he is aware that it is practically certain that his conduct will cause such a result.

(3) A person acts recklessly . . .when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

*See* 18 Pa.C.S. § 302(b)(1)-(3); 23 Pa.C.S. § 6303(a).

from B.W.'s forensic interview to the finding of abuse hearing, the trial court noted "there were delays with the law enforcement investigation [of] the abuse allegations," related to the question of where the Children were living at the time of the alleged abuse or allegations, and the fact the family had moved. Trial Ct. Op., 2/16/23, at 3. "These delays impacted CYF, who works in conjunction with law enforcement when referrals involve criminal allegations[, and both CYF] and the parties complained about reaching out to police departments and not receiving updates." *Id.* The trial court directed CYF to schedule a meeting with the District Attorney's Office and law enforcement, while increasing visitation for the Parents while the investigation was pending. *Id.* at 4. In October of 2021, a York Regional Police Detective "reached out to Mother and Father to schedule" and interview, but they were "unresponsive." *Id.*

Father's remaining arguments go to the weight of the evidence presented by CYF. The trial court noted that "at the hearing, Father proceeded on a theory that B.W.'s disclosures were not credible because he was coached." Trial Ct. Op., 2/16/23, at 9. The court, who bore the responsibility of weighing the evidence, "did not find that B.W. had been coached." *Id.* The court considered:

> The CAC summary . . . indicated that B.W. disclosed that his mom and dad beat him and his siblings and had slapped them, including El.A. B.W. reported being beat with a belt with spikes on it. B.W. reported witnessing El.A. being slapped and that this caused bleeding in El.A.'s mouth. B.W. further disclosed finding pills, witnessing drug use, and that his mommy and daddy did drugs.

- 13 -

The testimony regarding drug use was deemed credible as a referral had been made to CYF as a result of Father's overdose.

*Id.* at 10 (record citations omitted).

With respect to El.A.'s medical report, the trial court summarized:

[The report] revealed that EI.A. had been seen in the hospital for bleeding from the mouth when only twenty-two days old. The Court noted that a hospital child protection team inpatient consultation report listed a low suspicion of abuse "with the information available to date," but the final diagnosis was listed as unexplained. As such, the Court did not find this dispositive as to whether abuse occurred.

*Id.* (record citations omitted).

The trial court also reviewed the testimony of Ms. Carter and Caseworker Marshall, as summarized above, including Ms. Carter's opinion that B.W. could distinguish the truth from a lie. Trial Ct. Op., 2/16/23, 10-15. Finally, the court considered the statement of B.W.'s guardian *ad litem*, that "[he] fully believe[d] that [ B.W.] was credible, and . . . that his testimony in that interview support[ed]" CYF's petitions. *Id.* at 15, *citing* N.T., 3/10/22, at 53.

Upon review, we find no abuse of discretion. Father's arguments essentially seek to have this Court re-weigh the evidence and supplant the trial court's credibility determinations with our own. This we cannot do. *See Interest of R.J.T.*, 9 A.3d at 1190; *In re M.G.*, 855 A.2d at 73-74. As the record supports the trial court's finding of abuse, we do not disturb the court's credibility determinations and determinations as to weight of the evidence.

Lastly, we consider Father's reliance on the Commonwealth Court's unreported decision in *Lackawanna Co. Children & Youth Servs. v. Dep't*

*of Pub. Welfare*, 1441 C.D. 2011 (unpub. memo.) (Pa. Cmwlth. April 27, 2012) (*Lackawanna Co*), for the propositions that a child may be found not credible "based on [their] conflicting statements and lack of any corroboration."[12]   Father's Brief at 15.   We determine this decision is distinguishable.

First, as Father notes, *Lackawanna Co.* addressed a petitioner's-request to expunge an indicated report of child sexual abuse against him. *Lackawanna Co.*, 1441 C.D. 2011 (unpub. memo. at 1).  An administrative law judge (ADJ) conducted an evidentiary hearing, where the 15 year old child victim — the daughter of the petitioner's live-in girlfriend — testified the perpetrator abused her from the age of 11 to 14.  *Id.* at 4.  On cross-examination, the child was confronted with a handwritten recantation, which she had previously signed, of the allegations the petitioner had abused her. *Id.* at 4-5.  The child explained she signed the statement in a police station in Haiti, under her mother's threat to leave her there if she did not agree.  *Id.* at 5.  The ADJ weighed this evidence and found the child was **not** credible because of the inconsistency between her testimony and the written statement.  *Id.* at 10.  The ADJ thus recommended expunction of the indicated report of child abuse, and the Pennsylvania Department of Public Welfare,

---

[12] **See** Pa.R.A.P. 126(b)(1)-(1) (an unreported memorandum opinion of the Commonwealth Court, filed after January 15, 2008, may be cited for its persuasive value).

Bureau of Hearings and Appeals adopted this recommendation. *Id.* at 1. On appeal by the County Children and Youth Services agency, the Commonwealth Court affirmed, reasoning it was the function of the fact finder to resolve conflicts in testimony. *Id.* at 13.

First, we point out that **Lackawanna Co.** addressed a different type of proceeding — the expunction of an indicated report of child abuse — from that presented in the case *sub judice*. The Commonwealth Court considered the burden of proof in an expunction case, which is whether the county agency "present[ed] evidence, which outweighs any contrary evidence, that the alleged perpetrator's actions constituted child abuse." **Lackawanna Co.**, 1441 C.D. 2011 (unpub. memo. at 12). That burden of proof is not relevant here. *See Interest of X.P.*, 248 A.3d at 1276 (a court's finding of child abuse must be supported by clear and convincing evidence).

More importantly, the salient factor in the above discussion is not present here — inconsistent statements made by the child. Father does not point to any part of the evidence showing either B.W. or El.A. gave inconsistent statements about the abuse. Accordingly, the Commonwealth Court's decision does not support Father's argument for relief.

## VI. Conclusion

For the foregoing reasons, affirm the trial court's March 10, 2022, order finding Father was a perpetrator of abuse with regard to B.W. and El.A.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 08/28/2023