J-A20008-25

2025 PA Super 214

IN THE INTEREST OF: A.J., A MINOR   :    IN THE SUPERIOR COURT OF
                                      :             PENNSYLVANIA
                                        :

APPEAL OF: S.G., MOTHER           :
                                        :

                                        :    No. 355 EDA 2025

Appeal from the Order Entered January 10, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000677-2024

IN THE INTEREST OF: B.L., A MINOR   :    IN THE SUPERIOR COURT OF
                                        :             PENNSYLVANIA
                                        :

APPEAL OF: S.G., MOTHER           :
                                        :

                                        :    No. 356 EDA 2025

Appeal from the Order Entered January 10, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000678-2024

BEFORE:    MURRAY, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.[*]

OPINION BY MURRAY, J.:               **FILED SEPTEMBER 24, 2025**

       S.G. (Mother) appeals from the orders adjudicating her minor sons, A.J.

and B.L., born in January 2014 and June 2018, respectively (collectively,

Children), dependent, and placing Children in kinship care with their maternal

_____

[*] Retired Senior Judge assigned to the Superior Court.

uncle.[1]  After careful review, we reverse the orders and remand for a new dependency hearing.

On July 23, 2024, the Philadelphia Department of Human Services (DHS) filed applications for orders of protective custody (OPC) of Children, alleging that Mother had been involuntarily committed for a psychiatric examination pursuant to 50 P.S. § 7302 (Section 302).[2]  The applications claimed that Mother had left Children in the care of Z.G. (maternal aunt), but that maternal aunt "is handicapped and not physically able to care for [Children]."[3]  Applications for OPC, 7/23/24, at 2 (unpaginated).  That same day, the juvenile court granted DHS's applications for OPC.

A shelter care hearing took place on July 26, 2024, after which the juvenile court directed Children to remain in DHS's custody.  At that time, Children had been placed in the home of A.S. (maternal uncle) and maternal uncle's fiancée (M.H.).  The juvenile court permitted Mother visitation with Children "in accordance with hospital policy" and supervised visitation following her discharge.  Order, 7/26/24, at 1.

_____

[1] Br.L., B.L.'s biological father, and N.J., A.J.'s biological father, are not parties to this action and have not appealed the dependency determinations.

[2] Section 302 of the Mental Health Procedures Act (MHPA) provides, upon certification by a physician or authorization by the county mental health administrator, for involuntary emergency examination and treatment of a severely mentally disabled patient for up to 120 hours.  50 P.S. § 7302(a), (d).

[3] The record does not disclose where Mother and Children resided.

On August 1, 2024, DHS filed substantially similar dependency petitions pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6302,[4] and the Child Protective Services Law, 23 Pa.C.S.A. § 6303.[5] Therein, DHS alleged:

---

[4] DHS alleged B.L. was dependent pursuant to subsection (1) of the definition section of "dependent child," and that A.J. was dependent pursuant to subsections (1) and (5). 42 Pa.C.S.A. § 6302. The relevant subsections define a "dependent child" as one who:

> (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk;

> * * *

> (5) while subject to compulsory school attendance is habitually and without justification truant from school[.]

*Id.*

[5] DHS alleged Children were the victims of child abuse pursuant to "23 Pa.C.S.A. § 6303(b)(1)." Dependency Petitions, 8/1/24, ¶ 5. We note, however, that the General Assembly amended Section 6303, effective December 31, 2014, to replace subsection (b) with subsection (b.1). The pre- and post-amendment subsections both define "child abuse," but under different formulations. While DHS's pleading was unclear as to what manner of child abuse it averred, the allegations contained therein suggest DHS sought to prove Children were the victims of child abuse pursuant to Section 6303(b.1)(7) ("Causing serious physical neglect of a child."). Regardless, upon review, it does not appear that DHS requested a specific finding of child abuse, pursuant to 23 Pa.C.S.A. § 6370(b)(2)(i), or that the juvenile court made such a finding.

- 3 -

On December 12, 2023, DHS learned that [A.J. had] stopped attending … [s]chool on September 15, 2023. DHS received allegations that [Mother] stated that the school was located in an unsafe area[,] but she would attempt to have [A.J.] return to school; however, there was no more contact with the family.

On July 22, 2024, DHS received a General Protective Services (GPS) report alleging that the police were dispatched to the residence of [Mother] after she had presented herself to be in crisis. The report alleged that [Mother] was emotionally hysterical; that she had a blank stare; and that she was unresponsive while lying on the ground. The report alleged that [Children] were observed a block away from the home; that [C]hildren were without shoes or socks on their feet; that it was believed that [C]hildren had eloped from the home. The report further alleged that [Children] reside in the home of [] maternal aunt … with [Mother]. It was alleged that [maternal aunt] cared for [C]hildren sporadically and that she was wheelchair[-]bound. It was alleged that [Mother] was transported to Pennsylvania Hospital for further evaluation due to her unpredictable behavior. This report is pending determination.

On July 22, 2024, DHS visited the home of [maternal aunt]. DHS learned that [maternal aunt] was disabled and required 24-hour care. [Children] remained in the care of [maternal aunt,] with the assistance of other family members who were present in the home, including [] maternal uncle ….

DHS learned that following an evaluation at Pennsylvania Hospital, [Mother] was admitted to Friends Hospital for mental health concerns.

Dependency Petitions, 8/1/24, ¶ 5 (subparagraph designations omitted).

The matter proceeded to a dependency hearing on January 10, 2025.[6]

Mother appeared, represented by counsel. Children did not appear, but were

_____

[6] Originally scheduled for August 9, 2024, the dependency hearing was continued four times: (1) for "further investigation"; (2) for DHS to serve
*(Footnote Continued Next Page)*

represented by a child advocate attorney (Children's counsel).  DHS called as witnesses DHS caseworker Bernice Quetant (Ms. Quetant), and Community Umbrella Agency (CUA) case manager Sebastian Hope (Mr. Hope).[7]  Mother recalled Mr. Hope to provide testimony for dispositional purposes only.[8]

Ms. Quetant testified, over objection, concerning the GPS report that brought the family to DHS's attention:

> At the time of the report[,] the allegations were that [C]hildren were found without any caregivers.  [C]hildren were found in the

_____

notice of the hearing on Mother; (3) for "further investigation regarding witness and mental health records"; and (4) because the juvenile court had recently appointed Br.L. counsel.  Order, 8/9/24; Order, 9/3/24; Order, 10/24/24; Order, 11/22/24.  Only the August 2024 order identifies the moving party.  **See** Order, 8/9/24, at 1 (the juvenile court indicating that "ACS," which we discern is the court's shorthand for "assistant county solicitor," requested the continuance).  We note that the August 2024 order also indicates that Mother was still hospitalized on that court date.  **See id.** (providing, "Mother permitted to participate by phone if she's still hospitalized next court date." (capitalization modified)).

[7] Pertinently, during the witnesses' testimony, which spans approximately seventeen pages of the dependency hearing transcript, Mother lodged nine hearsay objections.  Unless otherwise noted, each objection identified *infra* refers to a hearsay objection lodged by Mother.

[8] A dependency hearing proceeds in two stages:

> The first stage requires the court to hear evidence on the dependency petition and to determine whether the child is dependent.  **See** 42 Pa.C.S.A. § 6341(a).  … If the court finds a child dependent, it proceeds to the second stage …, which requires an appropriate disposition based on the best interest of the child pursuant to [S]ection 6351(a) and (b).

**Interest of S.D.**, 334 A.3d 919, 925-26 (Pa. Super. 2025) (paragraph breaks and some citations omitted).

street without proper clothing. And then [C]hildren explained to the officers that responded that they had an aunt in the neighborhood.

[C]hildren took the officers to [maternal] aunt's home, and at that time, [the police] called … DHS because [maternal] aunt had some limitations and wasn't able to care for [Children] at that time.

N.T., 1/10/25, at 7-8.

Ms. Quetant explained, over objection, that she learned Mother "was on a [Section] 302 hold due to her mental status." *Id.* at 8. Over objection, Ms. Quetant testified that she visited Mother in the hospital while Mother "was on a 303 [(Section 303)[9]] hold." *Id.* at 9 (footnote added); *see also id.* at 12 (on cross-examination, Ms. Quetant admitting that she learned of Mother's commitment status from an unidentified source). Ms. Quetant stated that following the juvenile court's entry of the OPCs, DHS placed Children in kinship care with maternal uncle. *Id.* at 11.

Prior to Mr. Hope's testimony, Mother objected, stating "[i]t's my understanding that [Mr. Hope] was assigned to the matter well after the petition was filed, and so there's nothing that he could testify to that would be adequately noticed in the petition." *Id.* at 12. The juvenile court overruled

_____

[9] Section 303 of the MHPA provides for the continuation of a Section 302 involuntary commitment, for a period not to exceed twenty days, where a judge or mental health review officer determines that the person involuntarily committed "is severely mentally disabled and in need of continued involuntary treatment." 50 P.S. § 7303(c), (f).

Mother's objection, explaining, "I'll see what [DHS] tries to solicit. You can object at the appropriate time." *Id.* at 12-13.

Mr. Hope confirmed that he had the opportunity to review the family's CUA case file, but denied "observ[ing] any notes from the prior CUA [case] worker regarding interactions with [M]other[.]" *Id.* at 13-14. Mr. Hope further confirmed that he spoke with Mother "regarding this matter[,]" but DHS did not question Mr. Hope regarding any of his conversations or interactions with Mother. *Id.* at 14.[10]

Before the juvenile court made any findings regarding whether Children met the statutory definition of "dependent," Mother recalled Mr. Hope "just for disposition purposes." *Id.* at 17. Mr. Hope testified that, during supervised visitation, Mother's "interaction[s] with [Children] are positive and nurturing []. She stays and helps [Children] with homework; she plays with the toys, and has conversations [about] how their lives are going." *Id.* at 18; *see also id.* at 19 (Mr. Hope denying that he had "any concerns about [Mother's] behavior towards [C]hildren at the visitation[s].").

_____

[10] DHS presented no documentary evidence, and did not move for the admission of any exhibits. Further, DHS elicited no testimony concerning A.J.'s school attendance, ostensibly abandoning its allegation that A.J. is a dependent child pursuant to subsection (5) of the "dependent child" definition.

On cross-examination, Mr. Hope described an incident wherein Mother exhibited unprovoked "aggression" toward M.H. *Id.* at 20.[11] Mr. Hope explained that, as he and Mother

> were going in[to] the lobby of[] the [CUA facility at which Mother's supervised visitations occurred], [M]other approached resource parent [M.H.], and just started arguing, and escalated to a point where we tried to deescalate the situation where a person has to step in, [a] security guard, and then we had to escort [M.H.] out, and [security] had to try to contain [Mother] from trying to attack [M.H.] because [Mother] was still screaming [] and still insisting and following [M.H.] outside.

*Id.*; *see also id.* (Mr. Hope agreeing that "there are concerns about [Mother] having visitation [with Children] in the community that [would be] facilitated by [M.H.]").

At the conclusion of the hearing, the juvenile court adjudicated Children dependent, and placed Children in kinship care with maternal uncle. Mother filed timely notices of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statements (concise statements).[12] On February 27, 2025, the juvenile court filed a Rule 1925(a) opinion.

Mother presents the following four issues:

1. Did the [juvenile] court err by adjudicating [] Children dependent because there was not clear and convincing evidence that Mother's alleged mental health condition affected her ability to care for [] Children?

---

[11] Mr. Hope did not state when this incident occurred.

[12] We *sua sponte* consolidated Mother's appeals on February 20, 2025.

2. Did the [juvenile] court err by adjudicating [] Children dependent because an isolated incident of neglect is insufficient to establish dependency?

3. Did the [juvenile] court err by admitting inadmissible hearsay evidence?

4. Did the [juvenile] court err by removing [] Children because there was not sufficient evidence that it was clearly necessary that [] Children be removed from Mother's care?

Mother's Brief at 3 (issues reordered).

The standard of review in dependency cases

requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*Interest of S.K.*, 331 A.3d 74, 80 (Pa. Super. 2025) (quoting *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In the Interest of X.P.*, 248 A.3d 1274, 1276 (Pa. Super. 2021) (citation omitted).

We have further recognized that, in dependency cases, "the utmost concern is for the children's welfare and therefore nothing short of [a] comprehensive and searching inquiry[, by the juvenile court,] into the facts mandated by decisions of this [C]ourt will be acceptable." *Interest of K.B.*, 331 A.3d 50, 57 (Pa. Super. 2025) (citation omitted).

We consider Mother's first two issues together, as they each challenge the sufficiency of the evidence supporting the juvenile court's adjudication of

dependency. Mother claims that "DHS failed to establish both that Mother's unspecified mental health condition existed **and** that it affected her ability to care for [] Children at the time of adjudication." Mother's Brief at 13 (emphasis in original). Mother argues that "no competent evidence established that Mother had **any** mental health condition, was involuntarily hospitalized, or was unavailable to care for [] Children, because all of the testimony offered in support of those assertions was inadmissible hearsay." *Id.* (emphasis in original).

> Mother maintains that
>
> even assuming DHS had presented competent evidence to support a conclusion that Mother had a mental health episode that caused her to be hospitalized and that she failed to place [] Children in the care of an appropriate caregiver, one isolated incident of neglect five months prior to the adjudicatory hearing is insufficient to prove that [] Children are dependent under a clear and convincing evidence standard.

*Id.* at 17.

Mother emphasizes that, "[as] a matter of law, an isolated incident of neglect is insufficient to establish dependency by clear and convincing evidence." *Id.* (citing **In re D.A.**, 801 A.2d 614, 622 (Pa. Super. 2002) (*en banc*) (concluding the dependency petitioner failed to satisfy the clear and convincing evidentiary burden, where the trial court based its decision "on the fact that mother previously had been treated for depression, previously had been identified as a perpetrator in an 'indicated' Childline report, and presently was somewhat distracted when caring for her child." (emphasis omitted)).

- 10 -

Children's counsel counters that the juvenile court properly considered the "prognostic evidence" of Mother's neglect of Children preceding her involuntary mental health commitment. Participant's Brief at 9-10. Children's counsel emphasizes that

> the length of time between the adjudication and the incident precipitating the removal of [] Children [is not] dispositive when assessing a case based on prognostic evidence. **See**, **e.g.**, **Interest of S.D.**, 334 A.3d 919, 927 (Pa. Super. 2025) (juvenile court erroneously limited evidence to that which occurred within thirty days of the adjudicatory hearing, relying on its incorrect belief that dependency "is a current situation"; the evidence regarding the [G]PS report that opened the case was relevant and admissible, because it constituted permissible prognostic evidence and is "relevant to whether proper parental care of the children is immediately available at the hands of mother"); **K.B.**, 331 A.3d at 59-60 (reversing the juvenile court's decision to exclude evidence … as "irrelevant" and "stale," where evidence is relevant as prognostic evidence).

Participant's Brief at 10-11 (brackets omitted; citations modified).

As stated above, a "dependent child" is one who, *inter alia*, "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa.C.S.A. § 6302; **see also S.D.**, 334 A.3d at 927 ("[T]he definition of a dependent child is intended to be flexible and to encompass the myriad circumstances that may cause a child to be without proper parental care or control." (quotation marks and citation omitted)). "This Court has held a child will be declared dependent when he is presently without proper parental care or control, and when such care and control are not immediately available." **K.B.**, 331 A.3d at 56 (citation omitted).

- 11 -

> Proper parental care has been defined as that care which (1) is geared to the particularized needs of the child[,] and (2) at a minimum, is likely to prevent serious injury to the child. The question of whether a child is lacking proper parental care and control encompasses two discrete questions: whether the child presently is without proper care and control, and if so, whether such care and control is immediately available. In answering the first question, the paramount concern[] is the welfare of the child at the time of the hearing. In answering [] the second question, it may be necessary for the hearing court to look to the future.

*Id.* (citations, brackets, and quotation marks omitted).

After conducting a hearing, the juvenile court may adjudicate a child dependent if the petitioner has presented clear and convincing evidence that the child meets the statutory definition. *Interest of J.R.*, 333 A.3d 446, 452 (Pa. Super. 2025) (*per curiam*); *see also id.* (stating that clear and convincing evidence "is defined as evidence that is so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." (citation omitted)).

> In making this determination, [] the court must consider not only what sort of parental care the child received in the past, but also what sort of parental care the child will receive if custody is given to the parents. Because a finding that a child is dependent is very serious and could potentially [a]ffect a child's future attitude toward and relationship with his parent, we have urged trial courts to make comprehensive inquiries before concluding that a child is without proper parental care or control.

*In re Swope*, 571 A.2d 470, 472 (Pa. Super. 1990) (quotation marks and citations omitted); *see also In re N.A.*, 116 A.3d 1144, 1149 (Pa. Super. 2015) ("It is well settled that the proper inquiry in a dependency adjudication

follows a bifurcated analysis: Is the child *at this moment* without proper parental care or control?; and if so, is such care or control *immediately* available?" (emphasis in original; quotation marks and citation omitted)).

A juvenile court can, however, find a child dependent "on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." **S.D.**, 334 A.3d at 926. Indeed, we have observed that

> a rule prohibiting a court from considering prognostic evidence and compelling the court to place the child with natural parents to determine if they can render proper care "ignores the possibility that if the 'experiment' proves unsuccessful, the consequences to the child could be seriously detrimental or even fatal." **Matter of DeSavage**, 360 A.2d 237, 242 (Pa. Super. 1976).

**Id.** at 927 (citation modified).

Significantly, we do not review sufficiency claims on a diminished record, "but rather on the evidence actually presented to the finder of fact …." **D'Alessandro v. Pennsylvania State Police**, 937 A.2d 404, 410 (Pa. 2007) (plurality) (quoting **Commonwealth v. Lovette**, 450 A.2d 975, 977 (Pa. 1982)); **see also Interest of J.J.**, 283 A.3d 369 (Pa. Super. 2022) (unpublished memorandum at 11 n.5)[13] (in a dependency case, observing that the appellant's "contention that DHS failed to prove its case by clear and convincing evidence essentially challenges the sufficiency of the evidence,

_____

[13] Non-precedential decisions filed after May 1, 2019, may be cited for their persuasive value. **See** Pa.R.A.P. 126(b)(1)-(2).

which we cannot review on a diminished record." (citations omitted)); ***In the Interest of T.T.***, 224 A.3d 806 (Pa. Super. 2019) (unpublished memorandum at 11-12) (in an appeal from a child abuse determination in a dependency case, addressing a mother's sufficiency of the evidence claim before her evidentiary issues).

Instantly, the juvenile court explained its rationale for concluding that DHS proved, by clear and convincing evidence, that Children "were without proper parental care and control." Juvenile Court Opinion, 2/27/25, at 6.

> Children came into DHS care following an incident which led to Mother's involuntary hospitalization at Friends Hospital pursuant to Section 302 of the [MHPA]. The testimony reflects that DHS received a GPS report alleging that Mother was experiencing a mental health crisis and that [] Children were found in the street without proper clothing and without a caregiver. While [] Children were transported to [] maternal aunt's home nearby, an OPC was obtained shortly after it was determined that maternal aunt could not adequately care for [] Children. Additionally, neither Mother nor [Br.L. or N.J.] could immediately care for [] Children due to Mother's hospitalization[,] and the whereabouts of [Br.L. and N.J.] being unknown at that time. Th[e juvenile c]ourt heard credible testimony from … Ms. Quetant[] that there were concerns for [] Children's safety and welfare in Mother's care. The primary dependency concern involved Mother's mental health. …. The testimony [] reflected that when Ms. Quetant visited Mother at Friends Hospital, [Mother] was being held for extended involuntary treatment pursuant to Section 303 of the MHPA.
>
> [Children's r]emoval from Mother's care was necessary because the evidence demonstrated Mother's inability to provide [] Children with proper parental care and control. The record reflects that there were dependency concerns that were barriers to reunification with Mother, which primarily involved Mother's untreated mental health issues[,] as well as behavior concerns. …. Th[e juvenile c]ourt is greatly concerned that [] Children were found outside of [Mother's] home, alone, without a caregiver[,] while Mother suffered a mental health crisis. In addition to the

- 14 -

allegations in the GPS report, th[e juvenile c]ourt heard credible testimony from … Mr. Hope[] about continuing behavioral concerns regarding Mother. This included a verbal altercation[,] which required security assistance[,] when Mother became aggressive toward [M.H.] at the CUA agency. It is th[e juvenile c]ourt's opinion that Mother should undergo a mental health evaluation and make progress in mental health treatment before safe reunification with [] Children can occur.

*Id.* at 6-7.

Reviewing all of the evidence presented to the juvenile court, we conclude its factual findings are supported by the record and its legal conclusion is sound. *See D'Alessandro*, 937 A.2d at 410. The evidence adduced at the dependency hearing established that (1) Mother neglected Children, allowing them to leave her residence without adequate clothing or supervision; (2) Mother's neglect was caused by a mental health crisis that resulted in her involuntary commitment pursuant to Section 302; (3) Mother continued to be unable to care for Children due to the extension of her involuntary commitment pursuant to Section 303; (4) Mother's involuntary commitment extended to at least the August 9, 2024, court date; and (5) at some point during the approximately four months between the August 2024 court date and the dependency hearing, Mother initiated an unprovoked attack on M.H., which led Mr. Hope to opine that Mother was not amendable to community visitation with Children at the time of the dependency hearing. *See* N.T., 1/10/25, at 7-9, 20; Order, 8/9/24, at 1.

Further, contrary to Mother's suggestion, this Court in *D.A.*, *supra*, did not hold that "an isolated incident of neglect is insufficient to establish

- 15 -

dependency by clear and convincing evidence." Mother's Brief at 17. Instead, the **D.A.** Court determined the trial court erred when it found a child dependent on the basis of the following evidence: mother (1) was involuntarily committed two years before the child was born for depression; (2) was prescribed Zoloft during her four-day inpatient stay at the hospital "well before D.A. was born"; (3) failed to sterilize D.A.'s baby bottles; and (4) had, as a juvenile five years prior, engaged in the sexual abuse of a child she was baby-sitting. **D.A.**, 801 A.2d at 619-22. The **D.A.** Court concluded that

> the trial court based its decision on the fact that [m]other **previously** had been treated for depression, **previously** had been identified as a perpetrator in an "indicated" Childline report, and **presently** was somewhat distracted when caring for her child. We cannot conclude that this record contains clear and convincing evidence that D.A. "is without proper parental care or control" based upon evidence of conduct by [m]other "that places the health, safety or welfare of the child at risk…." 42 Pa.C.S.[A.] § 6302[.]

*Id.* at 622 (emphasis in original).

Mother also relies on **N.A.**, *supra*, which is likewise distinguishable. In **N.A.**, DHS filed dependency petitions alleging that mother left her two minor children without supervision. *Id.* at 1146. After a dependency hearing, a hearing master found that DHS's allegations were not supported by clear and convincing evidence, and the trial court adopted the hearing master's recommendation. *Id.* Over two months later, DHS filed a second dependency petition, "present[ing] virtually the same facts to support a finding of dependency[,]" which the trial court again denied. *Id.* at 1147, 1149. DHS

appealed. *Id.* at 1147. In affirming the trial court's order, the *N.A.* Court explained that

> [a] dependency adjudication requires an inquiry into the circumstances in which the petition is filed, specifically, whether proper care or control is available in that moment. It was proper, therefore, for the lower court to consider only the interim record, as those facts were controlling as to the issue of dependency. … The lower court's extensive review of the record demonstrates that [m]other was willing to provide proper care and control immediately, and had attempted to remedy any lapses in care. We find no abuse of discretion.

*Id.* at 1149-50 (citation and paragraph breaks omitted).

Both *D.A.* and *N.A.* are distinguishable and unavailing. The instant case involves allegations of Mother's debilitating mental illness, which deprived Children of "proper parental care or control" "necessary for [their] physical, mental, or emotional health, or morals." 42 Pa.C.S.A. § 6302. Our review does not require any determination that DHS **failed** to prove that Children were dependent, as was the case in *N.A.* Instead, we must accept the juvenile court's findings of fact and credibility determinations that are supported by the record. *See S.K.*, 331 A.3d at 80.

We further conclude the juvenile court did not abuse its discretion by considering Mr. Hope's testimony concerning Mother's unprovoked attack on M.H. in determining whether Mother was able to care for Children.[14] Mother's

_____

[14] Mother argues that the juvenile court could not consider Mr. Hope's testimony because "that testimony was only offered for dispositional purposes and[,] per the [juvenile] court, only considered for dispositional purposes."
*(Footnote Continued Next Page)*

- 17 -

outburst constituted appropriate prognostic evidence of Mother's mental health status (and her present ability to provide Children proper parental care), in view of her prolonged involuntary mental health commitment. *See* *S.D.*, 334 A.3d at 926 (stating prognostic evidence may support a finding of dependency).

Accordingly, based upon the foregoing, Mother's first two issues merit no relief.

In her third issue, Mother argues the juvenile court improperly "relied solely upon hearsay evidence that did not satisfy any hearsay exception" in adjudicating Children dependent. Mother's Brief at 8.[15] Mother argues that

_____

Mother's Reply Brief at 5 (emphasis omitted). While the juvenile court stated at the dependency hearing that "I'm sure [Mr. Hope] has something to say with regards to disposition," it further indicated to Mother that she could object to specific testimony. N.T., 1/10/25, at 13.

The adjudicatory and dispositional portions of a dependency hearing are governed by different evidentiary rules. *See* 42 Pa.C.S.A. § 6341(d)(1)(i) ("In disposition hearings … all evidence helpful in determining the questions presented … may be received by the court … even though not otherwise competent in the hearing on the petition."). Nevertheless, instantly, the juvenile court had not yet made a dependency finding when Mr. Hope testified, and Mr. Hope testified from his own personal observations of Mother's conduct. We see no reason for precluding Mr. Hope's testimony as incompetent for adjudicatory purposes.

[15] In her concise statement, Mother raised the following issue: "The [juvenile] court erred in admitting inadmissible hearsay evidence." Concise Statement, 2/6/25. Counsel for Children argues Mother's concise statement too vaguely described this issue, and that we should therefore deem it waived. Participant's Brief at 16. We note that the relevant portion of the hearing transcript amounts to approximately seventeen pages. Moreover, although
*(Footnote Continued Next Page)*

> the testimony that [] Children were observed on the street on July 22, 2024[,] and that Mother was [thereafter] involuntarily committed [is] hearsay[,] because [this testimony implicates] out-of-court statements from unnamed sources, and [the testimony was] being offered to prove that the Children were in fact left unattended and Mother had a mental illness that affected their care. ***See*** Pa.R.E. 801(c).

***Id.*** at 9.

> Mother continues,

> The [juvenile] court's decision to admit this testimony was not harmless error. The only non-hearsay testimony introduced in support of adjudication was [Ms. Quetant's] observation of Mother in a hospital. N.T., 1/10/25, at 9. However, there was no non-hearsay testimony as to precisely when [Ms. Quetant] observed Mother; how long [Ms. Quetant] interacted with Mother; how long Mother was in the hospital; whether [Mother] was visiting the hospital for the day, hospitalized overnight, or admitted for long[-]term care; her demeanor; her diagnosis; her recommendations for treatment; whether she complied with her treatment; or how her diagnosis affected her ability to care for [] Children. This single observation is plainly insufficient to prove that [] Children lacked proper parental care and control at the time of the [dependency] hearing.

Mother's Brief at 12 (citation modified).

_____

the juvenile court noted in its opinion that Mother "did not state in her [c]oncise [s]tatement … which specific statements she believed constituted inadmissible hearsay," it clearly had no difficulty apprehending and analyzing the pertinent testimony in question. Under these circumstances, we decline to find waiver. ***See Commonwealth v. Laboy***, 936 A.2d 1058, 1060 (Pa. 2007) (declining to find waiver based on a vague Rule 1925(b) statement, where the trial court "readily apprehended [the a]ppellant's claim and addressed it in substantial detail," and where the "evidentiary presentation span[ned] a mere thirty pages of transcript.").

In response, Children's counsel,[16] without citation to legal authority, argues that Ms. Quetant "testified to the contents of the GPS report she investigated to explain how she became involved in the case and to identify the relevant allegations, and further testified as to 'the steps she took to complete the investigation[.]'" Participant's Brief at 17 (quoting Juvenile Court Opinion, 2/2725, at 10). Children's counsel claims that

> [t]he juvenile court found that DHS properly laid the foundation for [Ms. Quetant's] testimony and it was relevant and admissible[.] (Trial Ct. Op. 10). [The court] further asserted that it did not rely "solely" on hearsay evidence, as Mother alleges (**see** Appellant's Br. 8); rather, it acknowledged the allegations in the GPS report, cited Ms. Quetant's direct observation of Mother, [who had been] admitted to a hospital (which treats patients with mental health concerns),[FN] and alluded to DHS'[s] determination, based on Ms. Quetant's personal assessment, that maternal aunt was unable to independently care for [] Children[.] (Trial Ct. Op.[, 2/27/25,] 6-7; **see** N.T.[, 1/10/25,] 7-11).
>
> ---
>
> [FN] **See** Friends Hospital website, *available at* https://friendshospital.com/ (hospital was "founded exclusively to help persons with mental illness").

***Id.*** at 16-17 (one footnote omitted; one footnote renumbered).[17]

---

[16] DHS does not address Mother's hearsay issue under a separate heading in the argument section of its brief. Instead, DHS summarizes testimony that it characterizes, in conclusory fashion, as "[t]his non-hearsay testimony" in support of its argument that DHS proved that Children are dependent. DHS Brief at 14, 15.

[17] We note Mother's objection to Children's counsel and DHS utilizing facts not of record in support of the arguments in their respective briefs, including Children's counsel's citation to the Friends Hospital's website and DHS's extensive citations to its own dependency petitions. **See** Mother's Reply Brief
*(Footnote Continued Next Page)*

"It is well settled that questions concerning the admission or exclusion of evidence [in dependency proceedings] are within the sound discretion of the trial court and will be reversed on appeal only where a clear abuse of that discretion exists." ***In re J.J.***, 69 A.3d 724, 730 (Pa. Super. 2013) (citation omitted). "The Rules of Juvenile Court Procedure provide that in adjudications, each party shall have an opportunity to present evidence **subject to the rules of evidence**. Pa.R.J.C.P. 1406(C), cmt." ***Interest of I.R.-R.***, 208 A.3d 514, 519 (Pa. Super. 2019) (emphasis added); ***see also In Interest of Gonzalez***, 386 A.2d 586, 589 (Pa. Super. 1978) (stating, "The Juvenile Act states that all proceedings shall be conducted in an informal but orderly manner. This of course does not mean that all rules of evidence are abandoned"; but noting that the Juvenile Act "does provide the judge wide latitude in assuring that the truth is brought out and the philosophy and purpose of the Juvenile Act is realized." (footnotes omitted)).

"To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." ***Interest of K.D.-Z.***, 330 A.3d 831, 837 (Pa. Super. 2025) (citation omitted). "A party

_____

at 4, 6. As it is well settled that we may not consider facts not in evidence, we do not do so in our review of the instant case. ***See Carlino E. Brandywine, L.P. v. Brandywine Vill. Ass'n***, 197 A.3d 1189, 1207 (Pa. Super. 2018) ("[A]ppellate courts normally do not consider matters outside the record or matters that involve a consideration of facts not in evidence. Most importantly, appellate courts do not act as fact finders, since to do so would require an assessment of the credibility of the testimony and that is clearly not our function." (citations omitted)).

suffers prejudice when the trial court's error could have affected the verdict."

***Commonwealth v. Tyack***, 128 A.3d 254, 257 (Pa. Super. 2015) (citation omitted).

The Pennsylvania Rules of Evidence define hearsay as a "statement that … the declarant does not make while testifying at the current trial or hearing" that the proponent "offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c).

> As a general rule, hearsay is inadmissible, because such evidence lacks guarantees of trustworthiness fundamental to our system of jurisprudence. The rule against admitting hearsay evidence stems from its presumed unreliability, because the declarant cannot be challenged regarding the accuracy of the statement. Notably, it is elemental that[] an out of court statement which is not offered for its truth, but to explain the witness' course of conduct[,] is not hearsay.

***In re K.A.T., Jr.***, 69 A.3d 691, 702 (Pa. Super. 2013) (quotation marks, brackets, and citations omitted).

Hearsay may be admissible if "it falls within one of the exceptions to the hearsay rule delineated in the Pennsylvania Rules of Evidence." ***Commonwealth v. Rivera***, 238 A.3d 482, 492 (Pa. 2020); ***see*** Pa.R.E. 802 (general rule against hearsay). One such exception is commonly referred to as the business records exception, which provides as follows:

> **(6) Records of a Regularly Conducted Activity.** A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if:
>
> > (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;

> (B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with [Pa.R.E.] 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6); ***see also In re A.J.R.-H.***, 188 A.3d 1157, 1167 (Pa. 2018) (in a termination of parental rights case, emphasizing the requirement that a "custodian or other qualified witness" authenticate purported business records).

Here, the juvenile court maintains that it properly admitted testimony during the adjudicatory portion of the dependency hearing, over Mother's hearsay objections, pursuant to the business records exception. Juvenile Court Opinion, 2/27/25, at 8. The juvenile court explained that

> [t]hroughout the adjudicatory hearing, Mother objected to … Ms. Quetant's[] testimony regarding the DHS investigation she conducted. Mother objected to Ms. Quetant[] testifying about the allegations in the GPS report, which led to [] Children's removal from Mother['s] care. Th[e juvenile] court overruled Mother's hearsay objections and allowed Ms. Quetant to testify regarding the allegations in the GPS report and the steps she took to complete the DHS investigation. Th[e juvenile] court found that Ms. Quetant's testimony regarding the DHS investigation was relevant and admissible, and that DHS properly laid the foundation for her testimony. Ms. Quetant testified that the GPS report was assigned to her, and she investigated the allegations. Her testimony regarding the DHS investigation was fundamental in

- 23 -

determining whether [] Children were safe in Mother's care and receiving proper parental care and control.

Juvenile Court Opinion, 2/27/25, at 9-10 (capitalization modified).

We are constrained to disagree.

We summarize Ms. Quetant's relevant, challenged testimony as follows:

- The GPS report alleged that Children were found on the street without supervision or appropriate clothing. N.T., 1/10/25, at 7.

- Police took Children to maternal aunt's house, and DHS learned that maternal aunt was unable to care for Children. *Id.* at 7-8.

- Mother was initially on a Section "302 hold," and subsequently held for further medical treatment pursuant to Section 303. *Id.* at 8-9.

Ms. Quetant's testimony concerning the GPS report was admissible for the limited purpose of explaining why DHS took certain actions. *See In re K.A.T., Jr.*, 69 A.3d at 702. However, it is clear the juvenile court considered this testimony for its truth, as we are unable to locate within this anemic record any non-hearsay evidence establishing the above facts.

The foregoing testimony plainly does not satisfy the business records exception, as Ms. Quetant did not testify that (1) the GPS report was made "at or near the time by … someone with knowledge"; (2) it was kept in the regular course of business; (3) it was prepared as part of a regular practice; or (4) that Ms. Quetant was a custodian of these kinds of records in the course of her employment. Pa.R.E. 803(6); *see also A.J.R.-H.*, 188 A.3d at 1167. Ms. Quetant testified that she observed Children in maternal aunt's home, and that she met with Mother while Mother "was in the hospital." N.T., 1/10/25,

at 8, 9. DHS did not ask Ms. Quetant to elaborate on any of her observations, made no effort to authenticate any documents, and proffered no documentary evidence whatsoever. In essence, Ms. Quetant's testimony merely ratified documentary evidence that was never produced, and repeated unnamed third-party accounts of the status of Mother's mental health treatment.[18] Consequently, we conclude that the above-referenced testimony was inadmissible hearsay.

Moreover, in its opinion, the juvenile court emphasized the allegation that "Children were found outside of the home, alone, without a caregiver[,] while Mother suffered a mental health crisis" was central to its dependency finding. Juvenile Court Opinion, 1/10/25, at 7. As these factual determinations are supported solely by inadmissible hearsay evidence, the admission of that evidence prejudiced Mother, and she is entitled to a new dependency hearing. *See K.D.-Z.*, 330 A.3d at 837; *Tyack*, 128 A.3d at 257.[19]

Accordingly, we reverse the juvenile court's orders finding Children dependent, and remand the case to the juvenile court for a new hearing to

_____

[18] We recently cautioned, in a termination of parental rights appeal, that child protective services agencies should not, in presenting their cases, "tak[e] the gamble that [a parent's] counsel w[ill] not object to [] multiple layers of hearsay." *In re Adoption of G.W.*, ___ A.3d ___, 2025 PA Super 152 (Pa. Super. filed July 21, 2025) (*en banc*) (slip op. at 42).

[19] Having determined Mother's third issue entitles her to relief, we need not address Mother's final issue.

occur as expeditiously as possible. In the interim, the status quo shall be maintained, and Children shall remain in their current placement.

Orders reversed. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/24/2025